## NATIONAL LABOR RELATIONS BOARD v. ASSOCIATED PRESS.*

No. 460.

Circuit Court of Appeals, Second Circuit.

July 13, 1936.

Charles Fahy, Gen. Counsel, and Robert B. Watts, Associate Gen. Counsel, both of Washington, D. C. (Louis A. Jaffer and Philip Levy, both of New York City, and David A. Moscovitz, of Washington, D. C., of counsel), for petitioner.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (John W. Davis, William C. Cannon, and Harold W. Bissell, all of New York City, of counsel), for respondent.

Greenbaum, Wolff & Ernst, of New York City (Morris L. Ernst and Callman Gottesman, both of New York City, of counsel), for American Newspaper Guild as amicus curiæ.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

This petition seeks the enforcement of an order issued by the petitioner pursuant to section 10 of the National Labor Relations Act (July 5, 1935, 49 Stat. 449, 29 U.S.C.A. § 151 et seq.). Respondent is a New York corporation, with its principal office in New York City, where the alleged unfair labor practice occurred.

November 7, 1935, the American Newspaper Guild, a labor organization, filed charges against respondent with the National Labor Relations Board, which accordingly issued its complaint alleging

*Writ of certiorari granted 57 S. Ct. 110, 81 L. Ed. —.

that respondent was engaged in the purchase, collection, receipt, compilation, and formulation of intelligence from within and without the United States and in the sale, distribution, and transmission of the same throughout the United States; that, in violation of section 8 (1 and 3) of the act, 29 U.S.C.A. § 158 (1 and 3), it had discharged and refused to reinstate one Watson, employed by it in an editorial capacity, because of his membership and activity in the American Newspaper Guild. Respondent is alleged to have thereby engaged in unfair labor practices affecting commerce as defined in the act. Respondent by answer admitted the discharge of Watson, but denied that the reason therefor was his membership in the American Newspaper Guild. An examiner held hearings on the complaint, but respondent, after participating in so much of the hearings as established the nature of its business, when its motion to dismiss on constitutional grounds was denied, withdrew. After further hearings, the examiner recommended reinstatement of Watson and payment of lost wages. This report was confirmed by the board which set forth its findings of facts and order. The present proceeding is a petition for the enforcement of this order.

The act creates the National Labor Relations Board and provides administrative and court procedure for the prevention of certain listed unfair labor practices "affecting commerce." Section 10 (a), 29 U.S.C.A. § 160 (a). "Affecting commerce" is defined as meaning "in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." Section 2 (7), 29 U.S.C.A. § 152 (7).

And "commerce" means "trade, traffic, commerce, transportation, or communication among the several States." Section 2 (6), 29 U.S.C.A. § 152 (6). Section 7 of the act, 29 U.S.C.A. § 157, proclaims the right of employees to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection. Section 8 gives specific content to the principles declared in section 7 and lists five unfair labor practices on the part of employers. It

is an unfair labor practice for an employer "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title]," or "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

General rules and regulations later adopted incorporated in detail the board's procedure.

The board found respondent, a membership corporation, to be a co-operative association of persons representing newspapers, with about 1,350 members, 1,200 of them daily newspapers. It receives information and gathers intelligence and information from members and other sources in all parts of the United States and in foreign countries, and formulates and distributes this to its members. It is affiliated with the Associated Press of Great Britain, which has a branch office in Paris, and news agencies associated with it are located in Berlin, Canada, and Japan. Respondent has division points throughout the United States for the collection of news. Each division has regional offices and membership newspapers reporting to it. Control over news is decentralized. Each collecting agent—regional office, member newspaper, division point—determines the value to other regions, divisions, and members of each item of news collected by or coming to it, and after editing, sends it along to other points or distributes it throughout the territory of which it is the key point according to its judgment of its interests for those points. The individual editorial employee preparing each particular item assumes a measure of responsibility for the effective functioning of the entire system. The method of communication is through the communication companies' telephone and telegraph trunk wires running from each division point.

As news is received in New York City, it is revised by editorial employees under the direction of supervising editors and then transmitted throughout the division and to the headquarters of other divisions to the extent warranted by the news. Each trunk line is controlled by a filing editor, who necessarily must be aware of the capacity of his line. During his shift, he is responsible for sending out—filing—over his line a "balanced" news report. Thus

the editor and editorial employees are trained to be able to determine the news value of items and to rewrite copy with speed and accuracy so that in the case of important news all the work on a particular item may be completed within a few minutes.

All those employees who are directly engaged in the transmission or distribution of news are in a "traffic department." The editorial employees are in the "news department," which includes the filing editors who determine what news is to go out on particular wires and who hand the typed items so prepared to members of the "traffic department" for transmission.

Watson was a member of the "news department." For a time he was a filing editor, but at the time of his discharge he was engaged in the revision or rewriting of news coming in over the wires prior to its distribution and filing as outgoing news.

The board's finding recites that "the operations of the respondent and of its editorial employees occur in the course and current of commerce among the several States and with foreign countries; are an integral part of the operations of the instrumentalities of such commerce; and constitute commerce among the several States and with foreign countries."

In its treatment of Watson, the respondent was found to have engaged in an unfair labor practice, which occurred in the course and current of commerce among the states and with foreign nations, and tended to lead to labor disputes burdening and obstructing commerce and the free flow of commerce.

The order issued directed the respondent to cease and desist from discouraging membership in the American Newspaper Guild or in any other organization of its employees by discharging, threatening to discharge, or refusing to reinstate any of its employees for joining the guild or any other labor organization of its employees, and from in any other manner discriminating against any of its employees in regard to hire or tenure of employment or any term or condition of employment for joining the guild or any other labor organization of its employees, and from in any manner interfering with, restraining, or coercing its employees in the exercise of their rights as guaranteed in section 7 of the National Labor Relations Act (29 U.S.C.A. § 157). Notice of compliance with the order was to be posted in the New York office. Respondent was also ordered to offer full reinstatement to Watson and to make up his lost pay.

The findings of the board as to the facts, if supported by evidence, are made conclusive by section 10 (c), 29 U.S.C.A. § 160 (c). See, also, Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 79 L.Ed. 1343; Florida v. United States, 292 U.S. 1, 12, 54 S.Ct. 603, 78 L.Ed. 1077; Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655. We must accept the fact that Watson was discharged because of his labor activities.

■ The relation of employer and employee in local industries, not directly affecting interstate commerce, is not subject to federal regulation under the commerce clause (Const. art. 1, § 8, cl. 3). Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; Carter v. Carter Coal Co., 56 S.Ct. 855, 869, 80 L.Ed. 1160. In United States v. E. C. Knight Co., 156 U.S. 1, 12, 13, 15 S.Ct. 249, 253, 39 L.Ed. 325, the court said: "Doubtless the power to control the manufacture of a given thing involves, in a certain sense, the control of its disposition, but this is a secondary, and not the primary, sense; and, although the exercise of that power may result in bringing the operation of commerce into play, it does not control it, and affects it only incidentally and indirectly. Commerce succeeds to manufacture, and is not a part of it. * * * The fact that an article is manufactured for export to another state does not of itself make it an article of interstate commerce, and the intent of the manufacturer does not determine the time when the article or product passes from the control of the state and belongs to commerce."

In Carter v. Carter Coal Co., supra, the court said: "One who produces or manufactures a commodity, subsequently sold and shipped by him in interstate commerce, whether such sale and shipment were originally intended or not, has engaged in two distinct and separate activities. So far as he produces or manufactures a commodity, his business is purely local. So far as he sells and ships, or contracts to sell and ship, the commodity to customers in another state, he engages in interstate commerce. In re-

spect of the former, he is subject only to regulation by the state; in respect of the latter, to regulation only by the federal government. Utah Power Co. v. Pfost, 286 U.S. 165, 182, 52 S.Ct. 548, 76 L.Ed. 1038. Production is not commerce; but a step in preparation for commerce. Chassaniol v. Greenwood, 291 U.S. 584, 587, 54 S.Ct. 541, 78 L.Ed. 1004."

But the federal power to regulate interstate communication which constitutes interstate commerce has been established so far as the instrumentalities of interstate communication are concerned, as in the regulation of telegraph companies or broadcasting stations. Pensacola Teleg. Co. v. Western U. Teleg. Co., 96 U.S. 1, 9, 10, 24 L.Ed. 708; Federal Radio Comm. v. Nelson Bros. Co., 289 U.S. 266, 279, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A. L.R. 406; Fisher's Blend Station v. Tax Commission, 56 S.Ct. 608, 80 L.Ed. 956. The business of respondent which merely is a special form or instance of interstate communication is included in the concept of interstate commerce. Transmission of intelligence across the state lines in its nature, is a form of intercourse or commerce among the states. In International Textbook Co. v. Pigg, 217 U.S. 91, at page 107, 30 S.Ct. 481, 485, 54 L.Ed. 678, 27 L.R.A.(N.S.) 493, 18 Ann.Cas. 1103, where the question was one involving the attempt by a state to require a license before allowing a foreign correspondence school to do business within the state, the court said: "If intercourse between persons in different states by means of telegraphic messages conveying intelligence or information is commerce among the States, * * * we cannot doubt that intercourse or communication between persons in different states, by means of correspondence through the mails, is commerce among the states within the meaning of the Constitution, especially where, as here, such intercourse and communication really relate to matters of regular, continuous business."

It appears clear that respondent in its business of gathering and distributing news is engaged in interstate commerce.

In Stafford v. Wallace, 258 U.S. 495, 521, 42 S.Ct. 397, 403, 66 L.Ed. 735, 23 A.L.R. 229, the court said: "Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and meet it. This court will certainly not substitute its judgment for that of Congress in such a matter unless the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent."

See, also, Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 37, 38, 40, 43 S.Ct. 470, 67 L.Ed. 839.

Industrial disputes in an industry or business engaged in interstate commerce may, and frequently do, burden and interrupt the flow of such commerce. Congress recognized this in section 1 of the act (29 U.S.C.A. § 151). The courts have done likewise. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; American Steel Foundries v. Tri-City, etc., Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360; Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963.

The removal from an instrumentality of commerce, or from a business engaged in interstate commerce, or from a business truly constituting a "throat" through which the current of commerce flows, of a fact determined by experience to be the cause of such disturbances, was within the power of Congress because it directly affected interstate commerce. Anderson v. Shipowners' Ass'n, 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298.

In respondent's business, although some of the news is obtained by the reporters locally, many dispatches come in from other states or foreign countries. All the news must be written or rewritten and is then given to operators of transmission instruments by responsible persons according to the needs of the members of the respondent in the various parts of the United States. A labor dispute affecting the rewriting staff would be a dam to the flow of this news and might or would cut off interstate and foreign receipts and transmission. Congress, recognizing this, had power under the commerce clause to enact suitable legislation to deal with practices which have been shown to obstruct or burden interstate commerce. Stafford v. Wallace; Board of Trade of City of Chicago v. Olsen, supra.

Industrial disputes in railroad systems, engaged in interstate commerce, were considered by the Supreme Court in passing

on the Railroad Act of 1926 (44 Stat. 577) amended in 1934 (48 Stat. 1186, 45 U.S.C.A. § 151 et seq.), as that of self-organizing and collective bargaining by labor. Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 434, 74 L.Ed. 1034. The court recognized the fact that labor disputes constituted a threat to interstate commerce and that a guarantee of the right of employees to bargain collectively would tend to reduce such disputes. It upheld the validity of the Railroad Labor Act under the commerce clause, saying: "Congress was not required to ignore this right of the employees but could safeguard it and seek to make their appropriate collective action an instrument of peace rather than of strife. Such collective action would be a mockery if representation were made futile by interferences with freedom of choice."

The employees in that case were baggagemen, ticket agents, train dispatchers, and similar clerical workers. In the instant case, the employees unit involved rewrites items of materials received and supervises and controls their transmission. Watson's work and that of the other editorial employees is an important factor in respondent's system of interstate and foreign intercourse. If Congress may, in order to facilitate the amicable settlement of labor disputes, seek to make "the appropriate collective action" of employees on interstate railroads "an instrument of peace rather than of strife," it may do so with respect to an interstate system devoted to interstate communication. Virginian Ry. Co. v. System Federation No. 40, 84 F.(2d) 641 (C.C.A.4, June 18, 1936), is a recent demonstration that the scope of the federal power is not limited to those employees actually engaged in interstate commerce, or upon an instrumentality of commerce. In Carter v. Carter Coal Co., supra, the Supreme Court recognized the class of cases exemplified by Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, which "rests upon the circumstance that the acts in question constituted direct interferences with the 'flow' of commerce among the states. In the Swift & Co. Case, livestock was consigned and delivered to stockyards—not as a place of final destination, but, as the court said in Stafford v. Wallace, 258 U.S. 495, 516, 42 S.Ct. 397, 402, 66 L.Ed. 735, 23 A.L.R. 229, 'a throat through which the current flows.' The sales which ensued merely changed the private interest in the subject of the current without interfering with its continuity. Industrial Ass'n v. United States, 268 U.S. 64, 79, 45 S.Ct. 403, 69 L.Ed. 849." In the present case, the editing of a message in interstate commerce is not a break in continuity equivalent to manufacturing a finished product from raw materials. Consequently, it is within the federal regulatory power.

█ The order promulgated by the board concerns protection of the right of self-organization under section 8 (1, 3), 29 U.S.C.A. § 158 (1, 3). Due process under the Fifth Amendment has not been contravened by this legislation. In Nebbia v. New York, 291 U.S. 502, 527, 528, 54 S.Ct. 505, 512, 78 L.Ed. 940, 89 A.L.R. 1469, the court said: "The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases." And 291 U.S. 502, at page 525, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469: "The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained."

The right of employees to organize has been recognized and accepted. See Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 570, 50 S.Ct. 427, 74 L.Ed. 1034; American Steel Foundries v. Tri-City, etc., Council, 257 U.S. 184, 209, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360. When employers attempt to destroy this right and disregard the representatives chosen by their employees, the strike is the natural and common method of employees to force recognition. It is not an unreasonable method of reducing the danger of strikes, destructive of commerce, to guarantee freedom from interference to employees in those businesses where a strike would have a direct and paralyzing effect on interstate commerce. Although there is no denial

in the act, of the employees' right to strike, a provocative cause is removed when employees are assured the opportunity to assert their rights in union. Statistics in the record show the frequency of strikes for organizational purposes. The experience under the Railroad Labor Act (45 U.S.C.A. § 151 et seq.) demonstrates the efficiency in reducing strikes of the guaranty of the right to bargain collectively.

This act does not hamper the legitimate right of the employer, who may discharge his employees for inefficiency or any other cause agreeable to him, provided he does not use the power of discharge as a weapon for interfering with the right of employees to organize and bargain collectively. The employer retains full control to bargain with his employees over the wage he shall pay and the working conditions he shall furnish. He remains the master of the operation of his business.

We think the order entered was validly made by the board and must be enforced.

Petition granted.