FOSTER BROS. MFG. CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.

No. 4074.

Circuit Court of Appeals, Fourth Circuit.

Oct. 6, 1936.

Leonard Weinberg and Harry J. Green, both of Baltimore, Md. (Weinberg & Sweeten and Zanvyl Krieger, all of Baltimore, Md., on the brief), for petitioner.

Charles Fahy, Gen. Counsel for National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Associate

Gen. Counsel for National Labor Relations Board, Thomas I. Emerson and Laurence A. Knapp, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

This case arose under the National Labor Relations Act of July 5, 1935, 49 Stat. 449, 29 U.S.C.A. §§ 151–166. Charges were filed with the National Labor Relations Board against the petitioner as an employer of labor by Federal Labor Union, Local No. 20137, a labor organization chartered by the American Federation of Labor, alleging the commission by the employer of certain unfair labor practices affecting commerce within the meaning of the act. The Board issued a complaint and gave notice of hearing. The complaint in substance alleged that the employer is a Maryland corporation, engaged at Baltimore in the production, sale, and distribution of bed springs, day beds, studio couches, and related products and equipment; that it had discharged and refused to reinstate 11 employees for the reason that they had joined the union, and that the employer had therefore engaged in unfair labor practices affecting commerce within the meaning of section 8, subdivisions 1 and 3, and section 2, subdivisions 6 and 7 of the act (29 U.S.C.A. §§ 152 (6,7), 158 (1, 3).

The employer filed a special appearance challenging the jurisdiction of the Board and the validity of the act on constitutional grounds, and without waiving its rights under this appearance, admitted the allegations concerning the nature of its business, but denied the allegations in regard to unfair labor practices. The objections were overruled by the Trial Examiner designated by the Board to hear the case, and hearing upon the complaint was held, at which counsel for the employer waived the right to present testimony and to cross-examine witnesses for the union.

After the hearing, the matter came before the Board which issued a decision containing in substance the following findings of fact supported by the evidence: The employer is in fact engaged in the business described in the complaint. In 1935 its sales totaled $390,000, and its employees averaged 125 in number. Eighty per cent. of the raw materials used in the manufacture of its products are shipped to Baltimore from states other than Maryland, and more than 50 per cent. of its finished products are sold and shipped to customers outside that state. Substantial shipments are made to warehouses of the company in Virginia and North Carolina as distributing points. Ninety per cent. of the products are sold to retailers and the remainder to mail order houses. Six traveling salesmen solicit orders in the various states other than Maryland.

In protest against an announced cut of 10 per cent. in wages, 70 of the employees held a meeting on December 4, 1935, rejected proposals for an immediate strike, but decided to form a union affiliated with the American Federation of Labor. This movement became known to officers of the corporation, and after investigation, 4 of the leaders in the movement were discharged; but were later reinstated through the intervention of the Board's Regional Director at Baltimore on December 12, 1935. The union movement persisted. A charter from the Federation was received at a meeting of seventy employees on December 11, 1935, and at a later meeting, officers, an executive board and a shop committee were selected by the local union. During the period from December 30, 1935, to January 15, 1936, the company discharged the 11 employees named in the complaint, including the officers, the shop committee and five out of seven members of the executive board of the local union. Efforts were made in a conference between the company's officials and a committee of the union to secure a reinstatement of the discharged men, but reinstatement was refused, whereupon the union members and sympathizers voted a strike and 88 employees went out. At the time of the hearing in February, 1936, sixty employees were still on strike.

The Board concluded that as to 10 of these employees, the acts and omissions of the employer constituted unfair labor practices within the meaning of the act, and under the authority of section 10 (c) of the act (29 U.S.C.A. § 160 (c), the Board directed the employer to cease and desist from such practices, and specifically to offer reinstatement with back pay to the 10 discharged employees and to offer employment to the employees on strike who had not secured employment elsewhere. Thereupon, the employer filed its petition for review praying that the order of the Board be reversed and set aside.

The employer does not question the findings of fact by the Board, but sets up the contentions (1) that the National Labor Relations Act does not apply to the employer's local manufacturing business, since it does not involve or directly affect interstate commerce; and (2) that if intended to apply thereto, the act is invalid (a) because it attempts to exercise a power and control over intrastate commerce not given to Congress by the federal Constitution; (b) because it violates the due process clause of the Fifth Amendment by interfering with the rights of employer and employees to enter into contracts of employment; and (c) because it delegates to the Board legislative power to decide in each case what form of organization is best suited to ensure to employees the right to self organization and collective bargaining, as provided in section 9 (b) of the act (29 U.S.C.A. § 159 (b).

It will be sufficient to consider the applicability of the act to the petitioner's manufacturing activity. Sections 7, 8 (1), 8 (3) and 10 (a) of the act (29 U.S.C.A. §§ 157, 158 (1, 3), 160 (a) are as follows:

"Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

"Sec. 8. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title]. * * *

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

"Sec. 10. (a) The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158) affecting commerce. This power shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise."

It will be observed that there is no limitation in sections 7 and 8 of the act (29 U.S.C.A. §§ 157, 158) restricting the terms "employer," "employees," and "un-fair labor practice", to persons or activities in interstate commerce; nor is such a limitation found in the definition of these terms in sections 2 (2), 2 (3), and 2 (8) of the act (29 U.S.C.A. § 152 (2, 3, 8). But the term "commerce" and the term "affecting commerce," as defined in sections 2 (6) and 2 (7) of the act (29 U.S.C.A. § 152 (6, 7) are so limited.

"Sec. 2. (6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country."

"Sec. 2 (7). The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

It is important to note that the power conferred upon the Board to prevent unfair labor practice set out in section 10 (a) is restricted to any person engaged "in any unfair labor practice * * * affecting commerce." We therefore conclude that the purpose of the act was to prevent unfair labor practice in interstate commerce on the part of those engaged in such commerce and not to interfere in the field of intrastate commerce in which Congress has no power to intrude and the specific question in this case is whether the employer was engaged in such business in its manufacturing plant when it discharged certain employees for union activity.

It is not the position of the Board that the act applies to all industry or to all employers and employees, but that by its terms it is applicable only where interstate or foreign commerce is subject to substantial interruption from industrial strife arising out of the unfair labor practices which the act prescribes. However, it is contended that when a substantial proportion of the raw materials or of the finished products of a manufacturing business move in interstate or foreign commerce, so that the flow thereof will be hampered or obstructed by industrial strife

in the factory, Congress has power under the commerce clause to adopt by legislation appropriate methods to eliminate or reduce such industrial strife on the ground that it constitutes a direct and substantial burden upon such commerce. In view of this contention, it may be immaterial whether the question to be now decided is considered to be one of statutory interpretation or of constitutionality; but since it may not be supposed that Congress intended to pass an unconstitutional law, we shall dispose of the case by determining whether the employer was engaged in interstate commerce within the established meaning of the phrase when it did the acts for which it was brought before the Board.

■ The answer, we think, has been recently given by the Supreme Court in Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, and Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160. In the Schechter Case it was held that dealers in poultry who bought in New York goods that had been shipped from other states, and then slaughtered and sold them locally, were not engaged in transactions in interstate commerce, and hence an attempt to fix the hours and wages of their employees under the provisions of a Code promulgated under section 3 of the National Industrial Recovery Act (48 Stat. 196) was not a valid exercise of federal power. The court said (295 U.S. 495, 546, 55 S.Ct. 837, 850, 79 L.Ed. 1570, 97 A.L.R. 947): "In determining how far the federal government may go in controlling intrastate transactions upon the ground that they 'affect' interstate commerce, there is a necessary and well-established distinction between direct and indirect effects. The precise line can be drawn only as individual cases arise, but the distinction is clear in principle. Direct effects are illustrated by the railroad cases we have cited, as, e. g., the effect of failure to use prescribed safety appliances on railroads which are the highways of both interstate and intrastate commerce, injury to an employee engaged in interstate transportation by the negligence of an employee engaged in an intrastate movement, the fixing of rates for intrastate transportation which unjustly discriminate against interstate commerce. But where the effect of intrastate transactions upon interstate commerce is merely indirect, such transactions remain within the domain of state power. If the commerce clause were construed to reach all

enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the federal authority would embrace practically all the activities of the people, and the authority of the state over its domestic concerns would exist only by sufferance of the federal government. Indeed, on such a theory, even the development of the state's commercial facilities would be subject to federal control."

The court also quoted with approval, the rule that it had previously stated in Industrial Ass'n v. United States, 268 U.S. 64, 82, 45 S.Ct. 403, 408, 69 L.Ed. 849, as follows: "The alleged conspiracy and the acts here complained of, spent their intended and direct force upon a local situation—for building is as essentially local as mining, manufacturing or growing crops—and if, by a resulting diminution of the commercial demand, interstate trade was curtailed either generally or in specific instances that was a fortuitous consequence so remote and indirect as plainly to cause it to fall outside the reach of the Sherman Act [15 U.S.C.A. § 1 et seq.]."

After the decision of the Supreme Court in the Schechter Case on May 27, 1935, Congress passed the Bituminous Coal Conservation Act of August 30, 1935, 49 Stat. 991, 15 U.S.C.A. §§ 801 to 827. That act established a National Bituminous Coal Commission and imposed an excise tax of 15 per cent. on the sale price of coal at the mine payable by the producer, subject however, to a drawback of 90 per cent. by any producer who should file his acceptance of a code to be formulated by the Commission with respect to minimum prices for coal and the right of employees to organize and bargain collectively, through representatives of their own choosing, free from interference or coercion of employers or their agents. The act also created a Labor Board and empowered it to adjudicate disputes arising under the provisions stated and to determine whether or not an organization of employees had been promoted or was controlled or dominated by an employer in its organization or management. Section 1 of the act (15 U.S.C.A. § 802) declared, amongst other things, that the production and distribution of coal bore upon and directly affected interstate commerce and rendered regulation of production and distribution imperative for the protection of such commerce.

A stockholder of the Carter Coal Company brought suit against the company and certain officers of the United States to enjoin the coal company from filing an acceptance of the code provided for in the act·and from paying any tax imposed under the act and from complying with the provisions of the act or of the code. The court held that the affirmations in the preamble with reference to interstate commerce did not constitute legislation by Congress, but.merely a recital of the considerations which in its opinion justified the provisions of the act; that the so-called excise tax on the sale price of coal was not imposed for revenue, but was exacted as a penalty to compel compliance with the regulatory provisions of the act, and that the mining of coal was a purely local business and did not constitute interstate commerce. The court said: (298 U.S. 238, 56 S.Ct. 855, 869, 80 L.Ed. 1160)

"One who produces or manufactures a commodity, subsequently sold and shipped by him in interstate commerce, whether such sale and shipment were originally intended or not, has .engaged in two distinct and separate activities. So far as he produces or manufactures a commodity, his business is purely local. So far as he sells and ships, or contracts to sell and ship, the commodity to customers in another state, he engages in interstate commerce. In respect of the former, he is subject only to regulation by the state; in respect of the latter, to regulation only by the federal government. Utah Power & L. Co. v. Pfost, 286 U.S. 165, 182, 52 S.Ct. 548, 76 L.Ed. 1038. Production is not commerce; but a step in preparation for commerce. Chassaniol v. Greenwood, 291 U.S. 584, 587, 54 S.Ct. 541, 78 L.Ed. 1004.

"We have seen that the word 'commerce' is the equivalent of the phrase 'intercourse for the purposes. of trade.' Plainly, the incidents leading up to and culminating in the mining of coal do not constitute such intercourse. The employment of men, the fixing of their wages, hours of labor, and working conditions, the bargaining in respect of these things— whether carried on separately or collectively—each and all constitute intercourse for the purposes of production, not of trade. The latter is a thing apart from the relation of employer and employee, which in all producing occupations is purely local in character. Extraction of coal from the mine is the aim and the completed result of local activities. Commerce in the coal mined is not brought into being by force of these activities, but by negotiations, agreements and circumstances entirely apart from production. Mining brings the subject-matter of commerce into existence. Commerce disposes of it.

"A consideration of the foregoing, and of many cases which might be added to those already cited, renders inescapable the conclusion that the effect of the labor provisions of the act; including those in respect of minimum wages, wage agreements, collective bargaining, and the Labor Board and its powers, primarily falls upon production and not upon commerce; and confirms the further resulting conclusion that production is a purely local activity. It follows that none of these essential antecedents of production constitutes a transaction in or forms any part of interstate commerce. Schechter Poultry Corp. v. United States, supra, 295 U.S. 495, at page 542 et seq., 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. Everything which moves in interstate commerce has had a local origin. Without local production somewhere, interstate commerce, as now carried on, would practically disappear. Nevertheless, the local character of mining, of manufacturing, and of crop growing is a fact, and remains a fact, whatever may be done with the products."

The respondent in the pending case seeks to distinguish it from the cases cited on two grounds: First, it is said that both the Schechter and Carter Cases dealt with local conditions and not with activity taking place. in the midst of the well-defined current of commerce; that in the Schechter Case, the flow of goods had ceased upon their arrival in the state where they were subsequently sold to local customers, and in the Carter Case, the flow of the coal from the mine at which it was produced had not yet begun. In the case at bar, on the other hand, there was an interstate movement from outside the state of Maryland of raw materials destined for final rest in the form of manufactured goods only after further movement in interstate commerce beyond the state, and so it is said that the interstate movement was not completed at Baltimore, but the goods and products were the constant subject of interstate trade and transportation.

It is nevertheless true that the operation by which the imported materials were transformed into finished products for export constituted the local business of man-

ufacture, and the subsequent shipment of the merchandise in interstate commerce did not change the intrastate character of their production. The decision of the Supreme Court in the Carter Case supports this statement, for the court said (56 S.Ct. 855, 868, 80 L.Ed. 1160): "That commodities produced or manufactured within a state are intended to be sold or transported outside the state does not render their production or manufacture subject to federal regulation under the commerce clause."

The cases cited in the Carter Case abundantly support this proposition. Thus it was said in Veazie v. Moor, 14 How. 568, 573, 574, 14 L.Ed. 545: "Nor can it be properly concluded, that, because the products of domestic enterprise in agriculture or manufactures, or in the arts, may ultimately become the subjects of foreign commerce, that the control of the means or the encouragements by which enterprise is fostered and protected, is legitimately within the import of the phrase foreign commerce, or fairly implied in any investiture of the power to regulate such commerce. A pretension as far reaching as this, would extend to contracts between citizen and citizen of the same State, would control the pursuits of the planter, the grazier, the manufacturer, the mechanic, the immense operations of the collieries and mines and furnaces of the country; for there is not one of these avocations, the results of which may not become the subjects of foreign commerce, and be borne either by turnpikes, canals, or railroads, from point to point within the several States, towards an ultimate destination, like the one above mentioned." See, also, Kidd v. Pearson, 128 U.S. 1, 20, 21, 9 S. Ct. 6, 32 L.Ed. 346; United States v. E. C. Knight Co., 156 U.S. 1, 12, 13, 15 S.Ct. 249, 39 L.Ed. 325; Coe v. Town of Errol, 116 U. S. 517, 526, 6 S.Ct. 475, 29 L.Ed. 715; Heisler v. Thomas Colliery Co., 260 U.S. 245, 259, 260, 43 S.Ct. 83, 86, 67 L.Ed. 237; Oliver Iron Mining Co. v. Lord, 262 U.S. 172, 178, 43 S.Ct. 526, 529, 67 L.Ed. 929. Reference was also made in the Carter decision to the cases which show that under certain circumstances, intrastate activities may so directly interfere with the flow of commerce among the states as to be subject to congressional legislation—for example, Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Stafford v. Wallace, 258 U.S. 495, 515, 516, 42 S.Ct. 397, 401, 402, 66 L.Ed. 735, 23 A. L.R. 229; but it was shown that nowhere in these cases is it suggested that the interstate commerce power extends to the growth or production of things which, after production, enter into the flow of commerce.

Second, it is contended by the respondent that the statutes considered in the Schechter and Carter Cases made provision for a type of regulation wholly different from that now under discussion, that is to say, a regulation of basic conditions of manufacture and production—wages and hours—for the purpose of stabilizing labor costs throughout an industry. On the other hand, the National Labor Relations Act, it is said, deals only with an incidental aspect of production, namely, the relation between the employer and his employees which it regulates by guaranteeing to the employees their well-recognized rights to organize and bargain collectively, and by requiring an employer to meet and bargain collectively with the representatives of his employees. It is suggested that these provisions are a valid exercise of congressional power because they tend to prevent labor disputes and therefore have an important and immediate effect upon the movement of goods in interstate commerce; but that unconstitutional control of manufacture or production is not involved, since the conditions of labor are only incidentally affected.

It is not easy to discern this distinction. The National Labor Relations Act was passed for the express purpose of securing to employees the rights of self-organization and collective bargaining, so that they might more easily secure desirable wages, hours of work, and laboring conditions generally. Congress intervened to secure these rights because it believed that without them satisfactory laboring conditions could not be peaceably obtained. But the Supreme Court has declared in the cited cases that, however commendable the purpose may be, Congress may not legislate with regard to local manufacture or production, and it seems obvious that this ruling must be respected not only with regard to the direct regulation by federal law of wages and hours of work in such industry, but also with regard to a statute designed to affect these matters substantially by prescribing the conditions to which employer and employees must conform when they negotiate and enter into contracts of employment. This conclusion becomes inevitable when we observe that the powers conferred upon the Board to

effectuate the policies of the act, authorize the Board to order an employer, who has been guilty of unfair labor practices, as defined in the act, to cease and desist therefrom and to reinstate discharged employees with or without back pay. A more direct and intimate control of local business by federal authority it is difficult to imagine.

We conclude that the National Labor Relations Board was not empowered by the statute to entertain the complaint filed with it against the petitioner, and that the order passed by the Board should be set aside, and the complaint against the petitioner should be dismissed. A decree to this effect will be passed by this court.[1]

---

[1] The National Labor Relations Act was held inapplicable to the business of manufacturing in National Labor Relations Board v. Jones & Laughlin Steel Corp. (C.C.A. 3) 83 F.(2d) 998, June 15, 1936; Fruehauf Trailer Co. v. National Labor Relations Board (C.C.A. 6) 85 F.(2d) 391, June 30, 1936; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., Inc. (C.C.A. 2) 85 F.(2d) 1, July 13, 1936. Compare National Labor Relations Board v. Associated Press (C.C.A. 2) 85 F.(2d) 56, July 13, 1936, in which the constitutionality of the act insofar as it affects interstate commerce was sustained.

