### NATIONAL LABOR RELATIONS BOARD v. WASHINGTON, VIRGINIA AND MARYLAND COACH CO.*

No. 4075.

Circuit Court of Appeals, Fourth Circuit.

Oct. 6, 1936.

Robert B. Watts, Associate Gen. Counsel for National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel for National Labor Relations Board, Jacob Blum, Laurence A. Knapp, Philip Levy, and Melvin C. Smith, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Writ of certiorari granted 299 U.S. —, 57 S.Ct. 112, 81 L.Ed. —.

Robert E. Lynch and William J. Hughes, Jr., both of Washington, D. C., for respondent.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The National Labor Relations Board filed a petition with this court for the enforcement of an order issued by the Board to the Washington, Virginia and Maryland Coach Company directing it to cease and desist from discouraging its employees from becoming members of a local division of a labor organization known as Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, and from interfering in any other manner with its employees in their exercise of their rights to self organization, or to join labor organizations, or to bargain collectively, through representatives of their own choosing; and also affirmatively requiring the coach company to offer reinstatement to certain employees, whom it had discharged, and make them whole for any loss of pay they had suffered by reason of their discharge.

The action of the Board was based upon the provisions of the National Labor Relations Act of July 5, 1935, § 1 et seq., 49 Stat. 449, 29 U.S.C.A. 151 et seq. The statute creates a National Labor Relations Board (section 3 [29 U.S.C.A. § 153]) with power to carry out the declared purpose of Congress to eliminate the causes of substantial obstructions to the free flow of commerce by encouraging the practice of collective bargaining, and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing for the purpose of negotiating the terms and conditions of their employment. (Section 1 [29 U.S.C.A. § 151]).

The definition of the terms "employer" and "employee" contained in section 2 (29 U.S.C.A. § 152) are broad enough to include persons engaged in commerce of any sort, but the term "commerce" is defined to mean trade, traffic, commerce, transportation, or communication among the several states and with foreign countries, and the term "affecting commerce" means in commerce, or burdening or obstructing commerce or the free flow of commerce, or leading to a labor dispute burdening or obstructing commerce or the free flow of commerce. Section 7 (29 U.S.C.A. § 157) contains the following declaration: "Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Section 8 (29 U.S.C.A. § 158) lists the following activities, among others, as unfair labor practices for an employer: (1) To interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 7; (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. Section 10 (29 U.S.C.A. § 160) entitled "Prevention of Unfair Labor Practices," (a) empowers the Board to prevent any person from engaging in any unfair labor practice affecting commerce; and (b) directs the Board, when it is charged that any person has engaged in such practice, to cause to be served upon him a complaint stating the charges and giving notice of hearing; and confers the right upon the person complained of to file an answer. Testimony may be taken, and if upon all the testimony the Board is of the opinion that the person named has been engaged in any such practice, the Board is required to state its findings of fact and to issue an order requiring the person to cease and desist from such practice and to take such affirmative action, including reinstatement of employees, with or without back pay as will effectuate the policies of the act.

The proceedings of the Board in the pending case included the filing of charges by the Labor Union, the issuance of a complaint and notice of hearing by the Board against the coach company, wherein it was alleged that the coach company was engaged in the operation of motor busses for the transportation of passengers and express in interstate commerce between the District of Columbia and points within the states of Virginia and Maryland, and that it had engaged in unfair labor practice within the meaning of subsections (1) and (3) of section 8 of the act (29 U.S.C.A. § 158 (1, 3) by discharging and refusing to reinstate 20 employees because of their membership and activity in the union. The respondent objected to the jurisdiction of the Board and moved that the complaint be dismissed on constitutional grounds, and without waiving these objections, filed an

answer admitting substantially the allegations as to the nature of its business and the discharge and refusal to reinstate the employees named, but denying that it had done so because of their membership or activity in the union.

A hearing was duly had during which the respondent's objections to the jurisdiction and motion to dismiss the complaint were denied, and after the conclusion of the hearing, the Board made findings of fact substantially as follows: The respondent is a Virginia corporation operating motor busses on a regular schedule between points in the District of Columbia and state of Virginia and occasionally operating busses between the District of Columbia and race tracks in the state of Maryland. It holds a certificate of convenience and necessity, in accordance with the Motor Carrier Act of 1935 (49 U.S.C.A. § 301 et seq.). It operates 48 busses and has approximately 80 employees, 50 of whom are drivers. Twenty-seven are garage employees and 3 are office employees. The respondent discharged 18 of the 21 employees named in the complaint by reason of their union membership and activity, and therefore discriminated against these employees in violation of section 7 of the act (29 U.S.C.A. § 157). Four of these employees were bus drivers and the remainder were mechanics and service employees engaged in repairing, cleaning and servicing busses. The Board accordingly found that the respondent had engaged in unfair labor practice as charged and issued the order described.

■ Section 10 (e) of the act (29 U.S.C.A. § 160 (e) provides that the findings of the Board as to facts, if supported by evidence, shall be conclusive. It is settled that in reviewing the findings of such a body, the court will not consider the testimony anew and make its own findings, since the weight to be given to the evidence and the inferences to be drawn therefrom are matters for the fact-finding body, and the function of the court in review is merely to reverse and modify such findings as have no evidence to support them and are clearly improper. Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S. Ct. 315, 318, 78 L.Ed. 655; Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 736, 79 L.Ed. 1343.

The evidence in the pending case on behalf of complainant tended to show that the discharge of the 18 men quickly followed the formation of the local union by the employees of the respondent, and in each case, the discharged man was a member of the union. A preliminary meeting of 24 employees was held at the home of one of them on February 24, 1936. Shortly afterward, officers of the company began to inquire of certain of the bus drivers as to their membership in the union, suggesting that they give further consideration to the continuance of their affiliation. Subsequently, advertisements for employees were inserted in Washington newspapers, and some applicants were hired to fill the places of the men later discharged. A circular was distributed amongst the employees suggesting that a sure way to acquire a poor standing, both in position and pay, in a business organization is to acquire good standing in a clique composed of members more concerned in serving their own ends than in serving the customers of the business. A subsequent meeting of employees was held on March 3, 1936. One of the men in attendance and subsequently discharged was informed by an officer of the company upon his return to work the same day that the officer would never recognize the union. On the three succeeding days, 21 employees, one-fourth of the total force, were discharged. All of them were members of the local union which then had 57 members amongst the respondent's employees. It was a reasonable inference from these facts that the discharge of the men was connected with their membership in the union and there was also direct evidence that the respondent's officials in certain cases expressly stated that the discharges were caused by the union activity of the men concerned.

This direct testimony was denied by the officials of the respondent, whose representatives asserted that each of the 18 men was discharged for inefficiency. It was also testified on behalf of the company that for some months prior to the discharge, the officers of the company, moved by reports of investigators and complaints of patrons in regard to the conduct of the employees and the condition of the vehicles, had been considering the dismissal of the men whom it let go in March, and instances of improper neglect and incompetency were related. According to this testimony, the difficulties increased from September and October, 1935, to February, 1936, and were the actuating causes which culminated in the conduct on which the complaint was based.

The testimony on behalf of the employer was not without weight, but it nevertheless appeared that the 18 employees, all of them being union men, were discharged within a period of 10 days after the first step towards the formation of the union was taken, and within a week after the officials of the company received information thereof. During this period they were actively endeavoring to prevent the union movement and to persuade their employees from joining or continuing therein. When these efforts failed, the discharges followed. Under these circumstances, it cannot be said that there was no substantial evidence to support the Board's findings, and consequently the petition of the Board cannot be dismissed for failure of proof.

The respondent, however, contends that the act is an invalid exercise of Congressional power in violation of the due process clause of the Fifth Amendment in that it denies to an employer the right to hire and discharge his employees at will. Emphasis is placed upon the decisions in Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764, and Coppage v. Kansas, 236 U.S. 1, 35 S. Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960. In the first case an act of Congress was declared unconstitutional which made it a misdemeanor for a common carrier to discriminate against its employees by discharge or otherwise because of membership in a labor union; and in the second case, a state law was declared invalid which made it unlawful for any individual to coerce or influence any person to enter into an agreement not to join a labor union as a condition of securing or continuing in employment.

These citations are not irrelevant, especially Adair v. United States, because there, as here, a carrier engaged in interstate commerce, in the commonly accepted meaning of that term, was involved, and vigorous argument was advanced by counsel for the United States and by the dissenting justices to sustain the act as a reasonable exercise of the power of Congress to regulate commerce between the states. But the difficulties which these decisions oppose to the validity of the National Labor Relations Act seem to us to have been removed by the more recent unanimous decision of the court in Texas & N. O. R. Co. v. Ry. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, interpreting the Railway Labor Act of 1926 (44 Stat. 577 [see 45 U.S.C.A. § 151 et seq.]). That statute, in order to avoid any interruption to the operations of carriers engaged in interstate commerce and to provide for the complete independence of carriers and employees in the matter of self-organization, and for the prompt and orderly settlement of disputes concerning working conditions, made it the duty of carriers and employees to exert every reasonable effort to make and maintain agreements concerning working conditions, and if possible, to consider and settle with expedition all such disputes as should arise, and declared that representatives should be designated by the respective parties without interference, influence, or coercion exercised by either party over the other. The District Court in the cited case after full hearing issued a temporary injunction restraining the railroad company from interfering with its employees in the designation of their representatives, in violation of the statute, but later found that the railroad company had endeavored to intimidate its union employees and to coerce them to withdraw from the union and to accept an association formed at the instigation of the carrier as their representative in negotiations between the parties, thus preventing employees from freely designating their own representatives. Thereupon the court directed that the carrier, in order to purge itself from contempt, should disestablish the association, reinstate the union as the representative of the men, and restore to service the men who had been discharged on account of union activity. 24 F.(2d) 426. Subsequently this injunction was made permanent, and the contempt order was reaffirmed, 25 F.(2d) 873; Id., 25 F.(2d) 876. The Circuit Court of Appeals found no error in the record, and affirmed the decree, 33 F.(2d) 13, and the Supreme Court also affirmed the decree stating that it did not go beyond the proper enforcement of the Railway Labor Act.

The Supreme Court held that the act conferred the right of independent self-organization upon the employees, free from interference on the part of the employer enforceable by the courts, and that the prohibition upon the carrier was not a violation of the Fifth Amendment, since it did not interfere with the normal exercise of the right of the carrier to select its employees and to discharge them. On this ground, Adair v. United States and Coppage v. Kansas were distinguished. The

court said (281 U.S. 548, 570, 50 S.Ct. 427, 434, 74 L.Ed. 1034): "The petitioners invoke the principle declared in Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764, and Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A. 1915C, 960, but these decisions are inapplicable. The Railway Labor Act of 1926 does not interfere with the normal exercise of the right of the carrier to select its employees or to discharge them. The statute is not aimed at this right of the employers but at the interference with the right of employees to have representatives of their own choosing. As the carriers subject to the act have no constitutional right to interfere with the freedom of the employees in making their selections, they cannot complain of the statute on constitutional grounds."

While the earlier decisions were distinguished, it is noteworthy that the argument of the court was based, as were the dissents in Adair v. United States, upon the power of Congress in the regulation of interstate commerce to safeguard the recognized right of the employees to organize and bargain collectively, to the end that effective negotiations between employer and employees may take place and the amicable settlement of disputes which threaten the agencies of interstate commerce may be promoted. In both instances it was thought that the statute involved was not an unreasonable restriction of the right of an employer to hire and discharge employees in violation of the Fifth Amendment, but rather a proper exercise of the power of Congress to safeguard and regulate interstate commerce. As the same argument may be made with equal application and force to the National Labor Relations Act, any doubt on our part should be resolved in favor of the constitutionality of the act. Indeed it is clear that the rights of employees, set out in section 7 of the act (29 U.S.C.A. § 157), are substantially the same as those secured by the Railway Labor Act of 1926; and that the power of the Board, conferred by section 10 of the later act (29 U.S.C.A. § 160) to direct an offending employer to cease violations of the act and to reinstate employees wrongfully discharged, was given as a means to make effective a policy common to both acts. It is not without significance that when similar means were employed in the contempt order of the District Court in Texas & N. O. R. Co. v. Ry. Clerks, the action of the court was approved on appeal.

We reached a similar result with regard to the Railway Labor Act, as amended by the Act of July 21, 1934 (45 U.S.C.A. § 151 et seq.), in our decision in Virginian Ry. Co. v. System Fed. No. 40, 84 F.(2d) 641.

■ The respondent also attacks the act on the ground that, as construed by the Board, it applies not only to interstate commerce, but also to the local industry of manufacture and production, and that therefore the whole act falls, notwithstanding the express declaration of section 15 (29 U.S.C.A. § 165) that if any provision thereof, or the application of such provision to any person or circumstance shall be held invalid, the remainder of the act, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby. In Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 885, 80 L.Ed. 1160, the Supreme Court sustained a similar contention in regard to the Bituminous Coal Conservation Act of 1935 (15 U.S.C.A. § 801 et seq.) on the ground that Congress there intended to accomplish certain general purposes of labor regulation and price fixing in the production of bituminous coal which were meant to operate together; and since one set of regulations could not be removed without fatal consequence to the whole, the invalidity of the provisions regulating labor conditions in the local industry of mining entailed the destruction of the whole act. There would be some basis for the application of this line of reasoning in the pending case if the Board's construction of the act were tenable, and it were reasonable to interpret the act as applying to intrastate as well as interstate activities. But as we have endeavored to show in an opinion filed this day in Foster Bros. Mfg. Co. v. National Labor Relations Board, 85 F.(2d) 984, the power conferred upon the Board to prevent unfair labor practices, as set out in section 10 (a) of the act (29 U.S.C.A. § 160 (a), is restricted to unfair labor practices affecting commerce, and commerce is defined to mean trade, traffic, commerce, or transportation among the several states or with foreign countries. Congress therefore did not intend to regulate intrastate as well as interstate commerce, and there is no ground for the argument that an important and inseparable

port of the act having been condemned, the whole act must fall.

A decree of this court will therefore be passed enforcing the order of the Board.[1]

---

[1] The constitutionality of the National Labor Relations Act, insofar as it affects interstate commerce, was sustained in National Labor Relations Board v. Associated Press (C.C.A. 2) 85 F.(2d) 56, July 13, 1936. Compare National Labor Relations Board v. Jones & Laughlin Steel Corp. (C.C.A. 3) 83 F.(2d) 998, June 15, 1936; Fruehauf Trailer Co. v. National Labor Relations Board (C.C.A. 6) 85 F. (2d) 391, June 30, 1936; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., Inc. (C.C.A. 2) 85 F. (2d) 1, July 13, 1936, in which the act was held inapplicable to the business of manufacturing.