**AGWILINES, Inc., v. NATIONAL LABOR RELATIONS BOARD et al.**

**No. 8171.**

Circuit Court of Appeals, Fifth Circuit.

Dec. 22, 1936.

Howard P. Macfarlane, of Tampa, Fla., for petitioner.

Charles Fahy, Gen. Counsel, National Labor Relations Board, and Robert B. Watts, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., for respondent.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Petitioner, through its operating division, the Clyde Mallory Lines, is engaged, coastwise, in the interstate transportation of freight and passengers, by steamship, to and from ports on the Atlantic and Gulf Coasts and Cuba, with agencies in some twenty-five cities of the United States. On April 24, 1936, pursuant to charges filed with him by the International Longshoremen's Association, Local No. 1402, the Regional Director for the Fifteenth Region, instituted proceedings against petitioner before the National Labor Relations Board. The complaint alleged that petitioner had engaged and was engaging in unfair labor practices affecting commerce, within the meaning of section 8, subds. (1–3) and (5), and section 2, subds. (6) and (7), of the National Labor Relations Act (29 U.S.C.A. § 158, subds. (1–3, 5), and § 152, subds. (6, 7).

Boiled down, the charges came to two. One was that on various dates between December 1, 1935, and February 24, 1936, petitioner had discharged seven named employees, the president and vice president, the secretary and treasurer, and three others who had been active in the Local, on account of their affiliation with it, and has since that time refused to reinstate them in their former positions: The other was that on or about March 26, 1936, petitioner did refuse and has at all times since refused to bargain collectively with the Local concerning the wages, hours, and working conditions of its longshoremen.

In May there was a hearing before a trial examiner, followed by briefs and arguments before the Board on the record as then made. On July 3, 1936, the Board, of the opinion that the charges had been sustained, stated its findings and issued and served on respondent its cease and desist order.[1]

---

Order

[1] "Upon the basis of the findings of fact and conclusions of law and pursuant to section 10, subdivision (c) of the National Labor Relations Act [29 U.S.C.A. § 160 (c)], the National Labor Relations Board hereby orders that respondent, Agwilines, Inc. and its officers and agents, shall:

"1. Cease and desist from in any manner discriminating against any of its employees in regard to hire and tenure of employment, or any term or condition of employment for joining or assisting Local No. 1402 or any other labor organization of its employees;

"2. Cease and desist from in any other manner interfering with, restraining or coercing its employees, in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively, through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid and protection, as guaranteed in section 7 of the National Labor Relations Act [29 U. S.C.A. § 157];

"3. Cease and desist from refusing to bargain collectively with Local No. 1402 as the exclusive representative of the longshoremen employed by it in respect to rates of pay, wages, hours of employment and other conditions of employment.

"4. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

"(a) Offer to John LaVell, Guss Harris, Michael Lazarus, McKay McDaniel,

The respondent has applied to this court under subdivision (f), section 10 of the act (29 U.S.C.A. § 160(f), by written petition, praying that the order of the Board be set aside. The Board has answered the petition to oppose the setting aside or modification of the order, and to pray that it be enforced as made. The matter then stands before us on the record as originally made, for hearing and determination as to whether the order of the Board shall be enforced as written, or set aside, or shall be modified and, as modified, enforced. Attacking it upon constitutional grounds, petitioner urges that the statute, upon the authority of which the order was based, is invalid, (a) because without any real or due relation to the commerce power upon which it purports to rest, and (b) because in undertaking to regulate petitioner's relations with its employees by compelling it to bargain collectively, and by preventing it from discharging its employees for union activities, it deprives petitioner of its property in violation of the due process clause of the Fifth Amendment. It attacks the order itself as without evidence to support it in respect to each and all of its requirements. It attacks it too, in respect of the provisions for reinstatement with back pay, as violative as to it, of the Seventh Amendment, because denying it a trial by jury, and of the Fifth Amendment, because depriving it of its property without due process of law.

With all deference to petitioner's insistence, supported by its thorough and workmanlike brief, that we treat as open and consider as res nova the constitutional questions it raises as to the authority of Congress, and the jurisdiction of the Board, over labor relations and disputes, between persons engaged in, and whose activities are a part of, interstate commerce, we must decline to do so. These questions were settled generally in favor of authority such as exerted here by Congress and the Board, by the decisions of this court and the Supreme Court in T. & N. O. R. R. v. Brotherhood of Railway Clerks (C.C.A.) 33 F.(2d) 13; Id., 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034. They have been reaffirmed in this and other Circuit Courts of Appeal as to the very act in question. We have indeed held that the Board may not, by a finding that the relation of employer and employee as such existing between persons who in their relations with each other are not engaged in interstate commerce, will affect that commerce, confer upon itself jurisdiction to take cognizance of such relations. National Labor Relations Board v. Jones & Laughlin Steel Corp. (C.C.A.) 83 F.(2d) 998; Other circuit courts have made the same holding. National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 85 F.(2d) 1 (C.C.A. 2); Fruehauf Trailer Co. v. National Labor Relations Board, 85 F.(2d) 391 (C.C.A. 6). On the other hand, we have held, as other Circuit Courts of Appeal have, that where employers and employees are actually engaged in interstate commerce, the Board has jurisdiction over complaints charging unfair labor practices, in connection with their relations. Bradley Lbr. Co. v. National Labor Relations Board (C.C.A.) 84 F.(2d) 97; National Labor Relations Board v. National New York Packing & Shipping Co., 86 F.(2d) 98 (C.C.A. 2); National Labor Relations Board v. Associated Press (C.C.A.) 85 F.(2d) 56; National Labor Relations Board v. Washington, Virginia & Maryland Coach Co., 85 F.(2d) 990 (C.C.A.4); cf. Virginia Railway Co. v. System Federation, No. 40 (C.C.A.) 84 F.(2d) 641.

---

Arthur Fisher, Perry Harvey and W. J. Johnson immediate and full reinstatement, to their former positions, without prejudice to any rights and privileges previously enjoyed by them;

"(b) Make whole each of the employees named in paragraph 4(a) above for any loss of pay he has suffered by reason of his discharge, by payment to him of a sum of money equal to that which he would normally have earned in respondent's employ from the date of his discharge to the date of the offer of reinstatement, computed at the rate, normal and overtime, equal to the average amount earned by those employees of respondent doing similar work in similar positions since his discharge.

"(c) Upon request, bargain collectively with Local No. 1402 as the exclusive representative of the longshoremen employed by it in respect to rates of pay, wages, hours of employment and other conditions of employment.

"(d) Post notices immediately to its employees in conspicuous type and in conspicuous places, including a conspicuous place "on the bricks" where the employees congregate for work, stating (1) that respondent will cease and desist in the manner aforesaid; and (2) that such notices will remain posted for a period of at least thirty (30) consecutive days from the date of posting."

Petitioner is mistaken in saying that what we said in Bradley Lbr. Co. on this point was obiter, and not necessary to the decision of that case. We were called upon to determine whether the act was incapable of constitutional application and therefore absolutely without force and effect, or had constitutional force. We determined deliberately and definitely that within the rule of the Brotherhood Case the act had a distinct field for constitutional application, the Board a distinct constitutional function. The Courts of Appeals for the Second and Fourth Circuits in the cases cited above, upon orders in substance identical with that at bar, have in reasoned opinions taken the same view. It would be a threshing of old straw for us to write further on these points.

■ Here it is admitted that petitioner and the employees affected by the order are engaged generally, in fact almost exclusively, in interstate commerce, and that the labor relations with which the Board has undertaken to deal are relations having to do with actual interstate commerce, indeed, with transportation in such commerce, the loading and unloading of ships moving interstate. The matter therefore comes before us upon an admitted state of facts, which clearly gives the Board jurisdiction, and brings the record, on which it acted, before us for examination, to determine under the statute, whether, and only whether, the findings of unfair labor practices the Board has made are supported by the evidence.

Before passing to an examination of those findings and of the record which is tendered in their support, we shall briefly consider and dispose of petitioner's constitutional points against the Board's order. We shall do this briefly, because as we have seen, every point it raises except one, that the statute authorizing and the order requiring reinstatement with back pay deprives petitioner of its rights to trial by jury in violation of the Seventh, and takes its property without due process in violation of the Fifth, has been gone into in reasoned discussions and in terms decided against it, and that one has been three times though without discussion of the point, also decided against it. The Second Circuit has twice, the Fourth Circuit once, in the cases cited above, affirmed orders for reinstatement with back pay identical with the one at bar.

In support of its claim that its constitutional rights are violated, petitioner contends that in its nature the claim, the statute in question gives to the injured employee upon his unfair discharge, is a legal action for damages, an action triable at common law, and not otherwise, and that therefore an award for damages against it may not be made administratively, but only upon and pursuant to a jury trial.

■ A short and simple answer to this contention is found in the fact that as between employer and employee the statute confers no right of action triable by a jury or otherwise. No provision in it authorizes an employee to make claim. The act does not purport to confer, it does not confer, private rights. It is only to rights and remedies as they were generally known and enforced at common law by jury trial that the amendment applies. Kohl v. United States, 91 U.S. 376, 23 L.Ed. 449; Crowell v. Benson, 283 U.S. 22, 51 S.Ct. 353, 75 L.Ed. 1430; Dimick v. Schiedt, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603, 95 A.L.R. 1150; Shields v. Thomas, 18 How. 253, 15 L.Ed. 368. The prohibitions against interference by employers with self-organization of employees were not only unknown, they were obnoxious to the common law. Pennsylvania R. R. System & Allied Lines Federation v. Pennsylvania R. R. Co., 267 U.S. 203, 213, 45 S.Ct. 307, 69 L.Ed. 574. The procedure the statute outlines is not designed to award, the orders it authorizes do not award, damages as such. The proceeding is not, it cannot be made, a private one to enforce a private right. It is a public procedure, looking only to public ends. The statute has in mind the maintenance and furthering of industrial amity, and therefore peace, the prevention of industrial war. Viewed as administrative procedure, the proceedings and orders in question present no constitutional difficulties. Thus, there may be, there are, administrative fines. Customs appraisers finally decide values. Licenses which the government confers it may and does take away, without a jury trial. The procedure provided here looks, to, the orders authorize, cease and desist orders to bring unfair practices to an end. That they reprobate and end them from the beginning presents no constitutional difficulty. Ample precedent exists in the Federal Trade Commission Act (15 U.S.C.A. § 41 et seq.) and the practices and decisions under it, for the authority granted here to the Board upon a finding that unfair labor practices have occurred to order a ceasing and desisting from them.

When the practices are found to be the wrongful discharge of employees, and the wrongful failure to restore them to work because of their union activities, it is clear, we think, that a cease and desist order, made operative under the authority of the statute from the time of discharge, is as clearly within constitutional authority as if made effective alone for the future.

The statute authorizes reparation orders not in the interest of the employee, but in the interest of the public. A cease and desist order operating retrospectively is not a private award, operating by way of penalty or of damages. It is a public reparation order, operating retrospectively by way of an order to cease and desist as to unfair practices, from their beginning; practices as to which, because forbidden in the interest of industrial amity, and therefore peace, Congress has the right to eradicate them as from the beginning.

■■ But if we could agree that the statute confers, the order enforces, a private right petitioner would be in no better case, for the statute may not be construed as establishing, the order may not be construed as adjudicating, a common-law right to damages. The statute fixes no tenure for employment, it gives no cause of action for discharge. If it gives any right, it gives a new one unknown to the common law and one which in its nature does not require, indeed does not admit of the arbitrament of a jury trial. Ample precedent for this kind of statute exists in Workmen's Compensation Acts. There determination of all questions is remitted exclusively to the jurisdiction of Boards. Pecuniary rights are established and denied upon Board findings without a jury. Such proceedings have been authoritatively declared to be not within the Seventh Amendment. "As between employee and employer, the act abolishes all right of recovery in ordinary cases, and therefore leaves nothing to be tried by jury." Mountain Timber Co. v. Washington, 243 U.S. 219, 37 S.Ct. 260, 264, 61 L.Ed. 685, Ann. Cas.1917D, 642; New York C. R. Co. v. White, 243 U.S. 188, 37 S.Ct. 247, 61 L. Ed. 667, L.R.A.1917D, 1, Ann.Cas.1917D, 629; Rowlette v. Rothstein Dental Laboratories, 61 App.D.C. 373, 63 F.(2d) 150. Statutory provisions of this kind in the public interest are not considered as conferring common-law rights requiring trial by jury. They provide for public proceedings, equitable in their nature. They exert power to restore status disturbed in violation of statutory injunction similar to that exerted by a chancellor in issuing mandatory orders to restore status. Brotherhood of Ry. & S. S. Clerks, etc., v. T. & N. O. R. Co. (D.C.) 25 F.(2d) 876, 877; approved T. & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 33 F.(2d) 13, 17; Id., 281 U.S. 548, 571, 50 S.Ct. 427, 74 L.Ed. 1034; cf. T. & N. O. R. R. v. Northside Belt Ry., 276 U.S. 475, 48 S.Ct. 361, 72 L.Ed. 661. Rejecting the contention, therefore, that there is any taking of property without due process, or any deprivation of trial by jury in the order for restoration with back pay, we conclude that the statute is within the power of Congress, that it applies to the situation in question, because the parties affected are actually engaged in interstate commerce and that the Board had jurisdiction to enter upon the inquiry and make findings and orders.

■ We take up then to determine whether on the record we have, its findings and orders are supported by evidence. We keep in mind in doing so that it is the Board's province to find the facts not alone as the direct testimony declares them to be, but as the background, setting, and circumstances under which that testimony was given and the matters testified about transpired, including the interests and motives of those testifying, give color and meaning to the testimony.

It was therefore for the Board, where the evidence offered a reasonable choice, to draw its own inferences and conclusions. If the evidence reasonably admitted of the conclusions they drew, we are bound by them. We may not, by substituting our own conclusions for the ones they drew, reverse theirs unless those conclusions are clearly improper, that is, the evidence affords no reasonable basis for them. Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67–73, 54 S.Ct. 315, 78 L.Ed. 655; Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52–63, 47 S.Ct. 255, 71 L.Ed. 534; Florida v. United States, 292 U.S. 1–12, 54 S.Ct. 603, 78 L.Ed. 1077; Helvering v. Rankin, 295 U.S. 123–131, 55 S. Ct. 732, 79 L.Ed. 1343; Del Vecchio v. Bowers, 296 U.S. 280, 56 S.Ct. 190, 80 L. Ed. 229; National Labor Relations Board v. Associated Press (C.C.A.) 85 F.(2d) 56.

The Board's findings are set forth in great detail. They consist of a careful and accurate summary of the facts testified to, and the Board's conclusions as to the

meaning and effect of those facts. A test of this summary by a careful reading and analysis of the long record discloses that the picture it presents of the background and setting of the scenes and actions under review, of the characteristics and circumstances of the various actors and of the actions themselves, is, though in miniature, full, fair and accurate. Nothing seems out of focus, nothing distorted. To one at all familiar with the history and traditions of the deep South, as they affect or are affected by the working relations between the white and black races, the picture of the conditions on the Tampa waterfront seems real and familiar. It is a picture, in the main, of an easygoing, kindly tolerance, and overlooking of the faults and omissions natural to a childlike, lighthearted, more or less irresponsible and pleasure loving lot of workers, when the relations between master and man are maintained with what is regarded by the dominant element in the relation as due recognition of that dominance, but with a vigorous tightening and application of discipline when deemed necessary to bring a sense of the true relations home.

Petitioner makes no serious complaint of the findings as they consist of a statement of the evidence. It could not, for faithfully and sufficiently they present the facts as the testimony reveals them. Petitioner's serious complaint is against the Board's conclusions. It insists that the facts detailed in the findings do not support the conclusions drawn, that, indeed, they demand just the opposite conclusions. It argues that though its findings disclose that as to each person discharged by petitioner there was a ground for discharge existing and assigned by it at the time, having no relation to his union affiliations, the Board disregarded this fact. It insists that the Board shuts its eyes to the reasonable and obvious conclusion that the discharge was for that cause, to conclude wholly without warrant, that the cause was seated in petitioner's deep feeling that labor unionism was wholly incompatible and irreconcilable with the kind of working conditions and the discipline it believed necessary to the relations and under the circumstances existing at the port, and therefore the cause of discharge was its deepseated and ineradicable antipathy to such unionism.

It insists that the same influences and processes which induced the false and unsupported conclusion that the discharges were for its antipathy to unionism, and not for individual cause, operated to induce the equally false and unsupported conclusion that petitioner had for that same antipathy, refused to engage in collective bargaining.

The Board, in defending its conclusion that the discharges were retaliatory, designed to hamper and ultimately to destroy the efforts underway, to unionize petitioner's men, and that petitioner deliberately refused to bargain collectively points to a record teeming with unmistakable evidences of petitioner's opposition to, and apprehension of the forming union. Particularly it points to petitioner's system of espionage over union activities, including its efforts to have LaVell, before his election to the presidency of the Local, to act as a lookout and contact man for it, to keep it advised of the union's progress; its having the chief of police pick up Henderson, the union organizer, and the fact if the result not of causal, but of casual coincidence, that of the seven men whose discharge is complained of, four were the chief officers of the Local, and the other three were active in it.

Finally, it points to the settled and firm position petitioner took throughout the trial, that the coming of the union had slackened efficiency among its men. That it has insisted and intends to insist, upon its right to apply its disciplinary methods individually to its men, in order to bring up their efficiency, and that it insisted throughout the hearing, and insists in the briefs, that the only conditions under which it will put men at and lay them off from work are tests of their willingness to work efficiently, individually applied to each worker, wholly without regard to the attitude or point of view of the Union as a Union, or of their membership in it.

As opposed to petitioner's insistence that it did not refuse to bargain collectively, and that it never has so refused, the Board points to the fact that though the organization had been trying for more than six months before the hearing to make itself felt in bettering the working conditions of the men, and had made overt and positive efforts to institute negotiations to that end, the record is bare of evidence that petitioner or any of its agents or officers have ever, except by the sitting in of its agent in the completely futile and abortive negotiations with the Maritime Association, recognized or dealt with the Local, or that petitioner has ever made advances to or encouraged advances from the Local to deal individually with it.

The case in its general features is greatly like the Brotherhood Case. Here, as there, the employer denied discriminatory activities. Here, as there, is much of protesting and denying of the specific charges, but no showing of a good faith, that is, an openminded, a wholehearted attempt to conform to and comply with the governing statute. No one can read the record of that case as its general features are disclosed in the five opinions written on it, three in the District Court, one in this, and one in the Supreme Court, and the record here without seeing here, as there, the same steady purpose, the same fixed resolution, not to conform to or comply with the statute, but if possible set it at naught, and the same general course of action to that end.

It must be conceded that the position is grounded here, as it was there, in the assertion of a strong and firm belief that the statute is not only wrong in principle, but represents an unauthorized attempt to exert power. Here is the same insistence upon the authority of the Adair and Coppage Cases (Adair v. U. S.), 208 U.S. 161, 186, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764; (Coppage v. State of Kansas), 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960; here, as there, the same determined and resolute stand for the "liberty" of the employer to set up and to put down, without interference from any source, to fix working conditions and standards, to hire and to fire individually at his own will, and independent of collective restraints. It must be conceded too, that petitioner, if it sincerely believes that the orders are invalid, has as the employer had in the Brotherhood Case, a constitutional right to test out the Board's power. We think it may not complain, though, if in the light of this determined opposition, the Board concluded as was done in the Brotherhood Case, that where action is equivocal, and one of two causes may have induced it, that the causa causans is to be found in the deepseated and determined opposition to the rule of the statute, and not to another cause, which under other circumstances has not in the past had such weight.[2]

The Board has found that the causes petitioner puts forward, though existing, were not the real causes for discharging the men. It has found too, that the purported collective bargaining between Ross and the Local heads on one side, and the Maritime Association on the other, was not a real bargaining, but a pretended one, gone through in form in order to avoid direct collision with the act.

Viewing the record as a whole, we think it may not be doubted that it makes a strong showing of opposition to and discriminatory action against the Union, and of the complete and utter futility of the negotiations, and that they were gone through under circumstances which foredoomed them to failure. It shows, too, that though petitioner's agent was present when the final request of the Local was made that the employers would at least deal with it collectively, and give its members preference, and the counter suggestion was made by the employers that this was a matter for each employer to settle individually, the record is wholly devoid of proof that any effort was made or any opportunity afforded to do so. The record makes it clear, too, that the employees in question, Southern colored laborers, working at the will of employers, with no fixed tenure, were at a great disadvantage in pressing their white employers for collective bargaining. It makes it clear, too, that no collective bargaining has ever gone on between petitioner and its men, and that adamant in regard to work, wage, and hour conditions, petitioner has never evidenced any willingness to meet with or to recognize the Union in a spirit of amity and co-operation.

When all these facts are considered in connection with petitioner's settled attitude of opposition to what it calls union interference, and in connection with the fact that no dealings were ever had by petitioner with, indeed, no recognition ever given the Local, with regard to work conditions, pay, or hours, we cannot say that the Board's conclusion that petitioner has engaged in unfair practices, within the meaning and intent of the statute, in discharging employees for union activities, and refusing to bargain collectively with them is without support in the evidence. We therefore sustain the Board's findings in general, and its cease and desist orders Nos. 1, 2, and 3.

---

[2] Brotherhood of Ry. & S. S. Clerks v. T. & N. O. R. Co. (D.C.) 24 F.(2d) 426; Id. (D.C.) 25 F.(2d) 873 and Id. (D.C.) 25 F.(2d) 876; Texas & N. O. Ry. Co. v. Brotherhood of Ry. & S. S. Clerks (C.C. A.) 33 F.(2d) 13, 17; Id. 281 U.S. 548, 571, 50 S.Ct. 427, 74 L.Ed. 1034.

As to order No. 4, which deals with the individuals discharged, and reparatively requires petitioner to offer each of them reinstatement to their former positions with back pay, without prejudice to the rights and privileges they enjoyed, we think that while as to some of the employees named, the order is well supported by the evidence, and when made more definite, should be enforced, as to others, it should not be.

As to Harris, the runner-up for, and LaVell, the president of the Association, Lazarus the secretary and McDaniel the inner guard, we think the finding that their discharge was for union activities is well supported by the evidence. It would be to shut one's eyes to the obvious to believe for a moment that LaVell, who supposedly had been, on the promise of Gillette to look after him, reporting as Gillette's lookout on the progress of the Union, was discharged the day after he was elected to its presidency, for the cause petitioner assigns, and not for his union activity, or in view of his past record of long service, that he was not kept "cooling off" indefinitely for those activities.

As to Harris and McDaniel, while the evidence is not so strong, the conclusion not so compelled, as in the case of LaVell, it is sufficient. As to Lazarus, the record upon his own testimony makes him out a rather pernickety, opinionated, argumentative [3] Jamaican negro, childlike in his actions and reactions, and according to petitioner's witnesses, childlike in his argumentativeness and sense of importance to the point almost, if not quite of insubordination. He presents a picture indeed, of a character almost as difficult to deal with as that seafaring fellow-countryman of his, whose argumentative stubbornness is dealt with in Trent v. Gulf Pacific Lines (D.C.) 42 F.(2d) 903.

We think, however, that the evidence supports the view the Board took, that in the light of his long service with petitioner, it was reasonable to conclude that the difficulties inherent in his case only became seriously insupportable to his employer when he became secretary of the Union, and that his discharge and overlong "cooling" period was directed more at his unionism than at his peculiarities.

As to Fisher, we think the Board's conclusion unsupported. Having overslept, he neither went to work nor notified his employer that he would not be there, and afterward he made no excuse for not coming. He had no office in the Union, he was replaced by a member of the Union, and he never returned to ask or to submit himself for re-employment.

As to Harvey and Johnson, the record leaves no doubt that, holding the most responsible positions in the gang, positions in which by inattention to their duties they could cause great injury to the ship or the cargo, and particularly to the men working in and about the ship, they were guilty of a piece of carelessness inexcusable in men of their experience and capacity. This carelessness not only caused injury to the ship, but drew complaint from its master. To have overlooked it without some disciplinary action would have been to put a premium on carelessness in positions where carelessness can least be tolerated, positions the due and proper discharge of the duties of which are essential to the safety not merely of the ship's property, but to the lives and limbs of men working there.

It is true that these men were officers in the Union, one vice president, the other treasurer. It is true that they were laid off for more than the average "cooling" time. It is true, too, however, that before the hearing ended, they were put back to work, Harvey in his old place and Johnson in the hold, both still officers of the Union, upon an agreement voluntarily made on their part, and with the approval of Ross, the union organizer on the part of the Union, and nothing appears but that they have been working there steadily and satisfactorily ever since. Under these circum-

---

[3] In his examination this appears:

"Trial Examiner Wood: Lazarus, attempt to answer the questions yes, or no, if you can.

"Lazarus—All right, sir.

"Trial Examiner Wood: Without any explanation.

"Lazarus: All right, sir." Record p. 294.

"Trial Examiner Wood: Now Lazarus, you just answer the question and make no explanation.

"Lazarus: All right sir.

"Trial Examiner Wood: In other words, so far as you can do so, say yes or no.

"Lazarus: All right, sir." Record p. 311.

"Trial Examiner Wood: Now, Lazarus, let that go. Just answer yes or no to the questions." Record p. 322.

stances, we cannot agree with the finding of the Board, that the discharge and subsequent treatment of these men, was actuated by their union activities, and that an order now unsettling the relations they have voluntarily settled, by raising as between them and their employers the contentious issue of back pay, would effectuate the policies of the act. The finding and order therefore, as to Fisher, Johnson, and Harvey is not approved. It will not be enforced, as to them.

As to the other four, while we affirm in principle sections (a) and (b) of the order, we think that as now framed they are too indefinite to serve as a basis for an order of enforcement, and we remand the matter to the Board as to those subdivisions with directions to take further proceedings. These proceedings in substance to be: (1) The direction of negotiations between the four men and petitioner, to determine whether they desire to return to petitioner's employ and petitioner will reinstate them under the terms named in subdivision (a). (2) The direction of negotiations between the four employees and petitioner, to determine the amount which will make them whole.

If the matter is not disposed of amicably, by agreement, the Board should make definite findings as the result of evidence taken in such proceedings, and definite orders on such findings, the same to be by supplement made a part of the transcript and record in this cause and submitted for our review. Subdivision (c) and (d) of paragraph 4 are approved and affirmed, and will be enforced as written.

An appropriate decree may be prepared and submitted for entry.