## NATIONAL LABOR RELATIONS BOARD v. BELL OIL & GAS CO. et al.

### No. 8438.

Circuit Court of Appeals, Fifth Circuit.

July 21, 1937.

Charles Fahy, Gen. Counsel, National Labor Relations Board, and Robert B. Watts, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., and Gerhard Van Arkel, of New Orleans, La., for petitioner.

O. R. Tipps and C. J. Brannan, both of Wichita Falls, Tex., for respondents.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

By this petition the Board seeks a court decree to enforce its order to cease and desist, and to take affirmative action, entered in a proceeding against respondents under the National Labor Relations Act (section 10).[1] The cease and desist portions of the order are in general terms. They forbid respondents from interfering with, restraining or coercing their employees in regard to membership in any labor organization, or otherwise in the exercise of their rights guaranteed in section 7 of the National Labor Relations Act.[2] The affirmative action ordered was with reference to one George E. Bebermeyer. It directed respondents to (a) "offer him immediate and full reinstatement without prejudice to rights and privileges previously enjoyed, dismissing Maxwell, if necessary"; (b) make him whole by payment of moneys equivalent to what he would have earned in respondent's employ in the periods covered by the order.

Respondents answer the petition and resist the enforcement of this order, on three general grounds; (1) jurisdictional, that the respondents are not engaged in "commerce," as that term is defined in subdivision (6) of section 2 of the act: "The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States," and that the activities made the subject of the Board's inquiry do not affect 'commerce' as that term is defined in the act—"The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."[3]

The point made on the first ground is that the activities of respondents and of their employees, out of and in connection with which the labor troubles, the strike, and the question of discrimination against Bebermeyer grew, are matters not of national, but of local, concern; have to do not with commerce among the states, but with the production of oil in a single state. The second and third grounds of resistance to the order are: (2) An attack upon the fact findings as unsupported by the evidence; (3) an attack upon the remedial order as (a) moot, because Maxwell, whom the Board ordered discharged, if necessary, to reinstate Bebermeyer, had already been discharged before the order was entered, and (b) as unsupported by the findings and the authority of the Board under the act, in requiring that the respondents reinstate Bebermeyer in addition to the two union men already re-employed, and divide among three work which required only two employees.

Upon the second point of attack the claim is made that the evidence does not support, that on the contrary it negatives, the finding that Bebermeyer, the employee ordered reinstated, was discriminated against, in regard to hire and tenure of employment, because of his membership and activities in the local. Respondents insist that the evidence permits no other conclusion than that the two employees working with Bebermeyer before the strike were re-employed and he was not, not because of Bebermeyer's union activities, but because

---

[1] Section 160, title 29 U.S.C.A.
[2] Section 157, title 29 U.S.C.A.

[3] Subdivisions (6) and (7), section 152, title 29 U.S.C.A.

the new plan of operation required only two, instead of three, men, and the two re-employed were more capable and efficient than Bebermeyer.

The third ground of attack (a) the mootness of the order, (b) its unsupport in fact and in law, searches the remedial order for its meaning and intended effect, and affirms or denies its validity according to that meaning.

The facts as to the business in which respondents are engaged, the nature and character of the activities involved in the dispute as "commerce," or "affecting commerce," the terms and tenure of Bebermeyer's employment before, the conditions leading up to, the consequences flowing from, and the action taken after, the strike, are all without dispute. They are well found by the Board.[4]

The Board's finding on jurisdiction was handed down after the Examiner had found no jurisdiction, and before the Supreme Court had on April 12, in the series of decisions of which the Jones & Laughlin Steel Corporation Case was the chief (National Labor Relations Board v. Jones & Laughlin Steel Corp., 57 S.Ct. 615, 81 L.Ed. ——, 108 A.L.R. 1352; National Labor Relations Board v. Fruehauf Trailer Co., 57 S.Ct. 642, 81 L.Ed. ——, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 57 S.Ct. 645, 81 L.Ed. ——, 108 A.L.R. 1352; Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 57 S.Ct. 648, 81 L.Ed. ——; Associated Press v. National Labor Relations Board, 57 S.Ct. 650, 81 L. Ed. ——), clarified the greatly disputed questions as to the scope and effect of the act. Upon a full recitation of the facts which amply supports its conclusion, the Board found that the respondents, engaged, as they were, in their repressuring operations in transporting gas to and from Texas and Oklahoma, were at least in the activities concerned in the Bebermeyer dispute engaged directly in interstate commerce, to wit, the transportation of gas among the states, and that labor conditions and troubles in connection with such operations had affected, and would affect, that commerce.

---

[4] Summarized, they are: Each of the respondents is engaged in producing oil from wells located in the bed of the Red River, which at that point forms the boundary between Oklahoma and Texas. Of these wells Bell operates 25 in Oklahoma, 7 on the Texas side; Reno 10 in Oklahoma, and one on the Texas side. Burke-Divide's 24 wells are in Oklahoma. Bell has an extensive system of gathering pipe lines, through which the oil it produces and purchases is transported from stock tanks, located near the wells to a central pump station on the Texas side of the Red River. This station is owned and operated by Bell as part of his pipe line department. The oil gathered here is pumped through its main pipe line to Bell's refinery, a short distance across the line in Oklahoma, at which gasoline, kerosene, and fuel oil are produced and sold in interstate and intrastate commerce. Burke-Divide and Reno sell their oil to Bell at their wells. All of these wells are small producers, the production from which is stimulated by means of a repressure system owned and operated jointly by all respondents.

Bebermeyer's employment was in connection with this repressure plant, which was under the active management of the Bell Oil & Gas Company, the matter of hiring and discharging employees, however, being done by concert of all the owners.

The operation of the repressure system consists of drawing natural gas from respondents' producing wells, piping it to the repressure plant, located in Texas, subjecting it to high pressure, and then pumping it back into so-called key wells, located in the river bed. The gas pressure thus created causes the oil underground to move toward the producing wells where it is pumped to the surface. The gas lines from the plant to the key wells are owned and the intake lines are leased by respondents. The gas obtained from their producing wells is not sufficient, and is augmented by gas purchased. In the operation of the repressure plant which is located in Texas, with its lines extending into Oklahoma, respondents draw gas from and pump it to wells located in both Oklahoma and Texas. Most of the gas drawn into the plant comes from Oklahoma into Texas, and most of it pumped into the key wells again crosses the state line into Oklahoma. Up until the time of the strike Bebermeyer was under Bohner as superintendent, in active charge of operations at the plant. His duties included checking the volume of gas passing through the system, testing the gas for air, attending and keeping the pipe lines to and from the plant in repair, operating and repairing the compressors in the plant, and checking the incoming and outgoing gas pressure and the precipitation of gasoline.

Before us the Board stands on that finding, but it insists further, upon the authority of the Jones & Laughlin, the Fruehauf, the Friedman-Marks, and the Associated Press Cases supra, that the activities of respondents, considered as a whole, were, and "affected," "commerce," and that the strike which followed the labor disputes, and the consequent shutdown of all the operations of respondents, both state and interstate, establish beyond question that the activities did affect commerce among the states, and that the labor disputes growing out of and connected with them were within the compass of the act.

Respondents vigorously contend that the facts that the operations were conducted on and near state lines, and that gas was transported from one state to another in connection with production operations, were simply incidents to mining operations, the production of petroleum. They urge that it is a far-fetched construction which would characterize as interstate commerce or transportation, repressuring activities merely because, incidental to them, gas was drawn through the lines from state to state. They also insist that nothing in the recent decisions of the Supreme Court, entered in disputes arising in industries and operatons nationwide in scope, supports the assertion of jurisdiction here.

█ We agree, not with respondents, but with the Board, upon both of the jurisdictional grounds it puts forward. Upon the first ground we think it may not be doubted that in their repressuring activities respondents were directly engaged in "commerce in," that is, interstate transportation of gas. If, as has been uniformly held, the carriage of stolen cars, of contraband oil, of women, of intoxicating liquor, from state to state, even though not for commercial, but only for personal, use, is transportation in interstate commerce, within the prohibition of acts forbidding such interstate transportation, certainly the transportation of gas from state to state in the operation of respondents' business is. Bebermeyer, 'the employee in question, as active operator of the repressure plant, was therefore directly engaged in interstate commerce, to wit, the transportation of commodities for commercial uses from state to state.

We think, too, that the disruptive results of the strike in completely stopping not only the activities of the repressure system, but those of the pipe line system, which carried oil to the refinery, and of the re-

finery itself, leave no doubt that, situated and engaged as these companies were, labor disputes among their employees not only might, but did, affect interstate commerce within the scope and meaning of the act.

█ The act is not confined in its jurisdiction to industries operating upon a nation-wide scale. It extends to and embraces within its scope all activities, large or small, which are, or which affect, "commerce" as defined in it. By every test of the decisions the commerce power exerted in the act extended to this dispute, and to those involved in it. A few quotations from some of the recent decisions will show this:

"It is the nature of the work done and its relation to interstate transportation which afford adequate basis for the exercise of the regulatory power of Congress." Virginian Ry. Co. v. System Federation, 57 S.Ct. 592, 604, 81 L.Ed. 789.

"Interstate communication of a business nature, whatever the means of such communication, is interstate commerce regulable by Congress under the Constitution. This conclusion is unaffected by the fact that the petitioner does not sell news and does not operate for profit, or that technically the title to the news remains in the petitioner during interstate transmission." Associated Press v. National Relations Board, 57 S.Ct. 650, 654, 81 L.Ed. ——.

"The grant of authority to the Board does not purport to extend to the relationship between all industrial employees and employers. Its terms do not impose collective bargaining upon all industry regardless of effects upon interstate or foreign commerce. It purports to reach only what may be deemed to burden or obstruct that commerce and, thus qualified, it must be construed as contemplating the exercise of control within constitutional bounds. It is a familiar principle that acts which directly burden or obstruct interstate or foreign commerce, or its free flow, are within the reach of the congressional power. * * * It is the effect upon commerce, not the source of the injury, which is the criterion." National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 621, 81 L.Ed. ——, 108 A.L.R. 1352.

"The congressional authority to protect interstate commerce from burdens and obstructions is not limited to transactions which can be deemed to be an essential part of a 'flow' of interstate or foreign commerce. Burdens and obstructions may be due to injurious actions springing from

other sources. The fundamental principle is that the power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection and advancement' * * * to adopt measures 'to promote its growth and insure its safety' * * * 'to foster, protect, control, and restrain.' * * * That power is plenary and may be exerted to protect interstate commerce 'no matter what the source of the dangers which threaten it.' * * * Undoubtedly the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government. The question is necessarily one of degree. * * *

"It is said that this exercise of federal power has relation to the maintenance of adequate instrumentalities of interstate commerce. But the agency is not superior to the commerce which uses it. The protective power extends to the former because it exists as to the latter. * * * It is thus apparent that the fact that the employees here concerned were engaged in production is not determinative. The question remains as to the effect upon interstate commerce of the labor practice involved. * * * We have often said that interstate commerce itself is a practical conception. It is equally true that interferences with that commerce must be appraised by a judgment that does not ignore actual experience. * * * But, with respect to the appropriateness of the recognition of self-organization and representation in the promotion of peace, the question is not essentially different in the case of employees in industries of such a character that interstate commerce is put in jeopardy from the case of employees of transportation companies. And of what avail is it to protect the facility of transportation, if interstate commerce is throttled with respect to the commodities to be transported!" Id., 57 S.Ct. 615, 624, 81 L.Ed. ——, 108 A.L.R. 1352.

These expressions leave in no doubt, we think, that whether the labor disputes in question here be regarded from the standpoint of the activities of the repressure plant in transporting gas from state to state, or from that of their effect as a whole, upon interstate commerce, they did, within the scope and meaning of the act, "affect" such commerce so as to give the Board jurisdiction. The question of whether the fact findings are supported by the evidence, and the order by the findings, and the law as well as whether the judicial action the petition invokes is in connection with a matter now moot, because of Maxwell's discharge, is a more difficult one.

■■■ "The act does not compel the petitioner to employ any one." Associated Press v. National Labor Relations Board, supra, 57 S.Ct. 650, 655, 81 L.Ed. ——.

"The act does not compel agreements between employers and employees. It does not compel any agreement whatever." Jones & Laughlin Steel Corporation, supra, 57 S.Ct. 615, 628, 81 L.Ed. ——, 108 A.L.R. 1352. "The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion." Id., 57 S.Ct. 615, 628, 81 L.Ed. ——, 108 A.L.R. 1352.

To which may be added that the act does not authorize the imposition of penalties, or the making of unreasonable requirements by the Board. Agwilines v. National Labor Relations Board (C.C.A.) 87 F.(2d) 146.

"The act establishes standards to which the Board must conform. There must be complaint, notice and hearing. The Board must receive evidence and make findings. The findings as to the facts are to be conclusive, but only if supported by evidence. The order of the Board is subject to review by the designated court, and only when sustained by the court may the order be enforced. Upon that review all questions of the jurisdiction of the Board and the regularity of its proceedings, all questions of constitutional right or statutory authority are open to examination by the court." National Labor Relations Board v. Jones & Laughlin Steel Corp., 57 S.Ct. 615, 629, 81 L.Ed. ——, 108 A.L.R. 1352.

■■■ If the facts found by the Board support its order, and the evidence supports the findings, and if the order is within the scope of the regulatory provisions of the act, the court will enforce it. If otherwise, it will not do so.

It is thus seen that the function of the courts in the operation of the act is by no means perfunctory. Upon them rests the final judicial responsibility, from them emanates the sole authority, for making the Board's orders coercively effective. Upon them is conferred the jurisdiction, upon them rests the solemn duty, to judicially determine finally and for themselves the remedial decree that shall be entered. It is for them to say whether the order the Board has entered will be enforced, or modified and enforced, or set aside in whole or in part. It is only as to its fact findings, when they are supported by the evidence, that the action of the Board is binding upon the courts. The statute provides that the jurisdiction of the court shall be exclusive, and its judgment and decree final. On a petition to enforce, it is therefore the duty of the court to determine, in the exercise of an informed judicial discretion, whether, in the light of the Board's findings if they are sustained by the evidence, its order shall be enforced, modified or set aside. It is its duty to enforce the order as written, both in its prohibitory and in its mandatory phases, if in its opinion the order is supported by findings, and is such an order as under the law should properly have been entered. It is its duty to decline to enforce it, if in the opinion of the court it is not so supported by the law and the facts.

In their answer respondents assert, and there is no denial, that the man Maxwell, whom the Board directed them to discharge if necessary, to re-employ Bebermeyer, had been out of their employ for nine months before the Board made its order, and that this was made known to the Board at the hearing. In their answer respondents assert, and there is no denial of it, indeed, the Examiner finds, as the Board does, that under the system of operation made effective after the strike only two men are needed to operate the repressure plant. The Board, however, finds that the fact of Bebermeyer's seniority, the fact that Maxwell, a nonunion employee hired since the strike, performed in part some of the duties previously performed by Bebermeyer, taken in connection with Bebermeyer's activities in and for the union, and his employers attitude toward those activities, sufficiently show that Bebermeyer was discriminated against on account of his union activities, that he would, in short, have been re-employed after the strike but for them.

We agree with the Board in this conclusion, and, if its order had been simply to reimburse and reinstate Bebermeyer, with the consequence that one of the two men re-employed should be discharged; if in short, the order, properly construed, is an order to reimburse Bebermeyer and reinstate him in the place of one of the employees necessary to the operation of the plant, we think it supported by the evidence, the findings, and the law, and that it should be affirmed. The order, however, is not so framed, nor is it at all clear that it was intended to have that effect. As drawn, in the light of its own specific language, that Bebermeyer should be reinstated, dismissing Maxwell if necessary, and in the light of that part of the Board's findings denominated "The Remedy,"[5] the order appears to have been intended to have the effect either of directing Bebermeyer's reimbursement and re-employment only in Maxwell's place, or of directing his reimbursement for time lost and his reinstatement, not as one of the two employees needed under the new plan to operate the repressure plan, but as one of three, thus requiring the respondents to employ three men for work for which only two are necessary. If it is intended as an order to re-employ him by discharging Maxwell, it is moot, because Maxwell has long since been discharged. While if it is intended as an order requiring his re-employment, and the retention, too, of the two other employees when only two in all are needed, the order is without warrant in the law.

---

[5] "As previously stated, the respondents are now operating only one compressor at a time in the repressure plant and claim that only two engineers are now needed to operate the plant. It is clear, however, that Maxwell, the nonunion employee hired since the strike, performs in part some of the duties previously performed by Bebermeyer. We will therefore order the respondents to reinstate Bebermeyer, and to dismiss Maxwell, if necessary, in order to reinstate Bebermeyer. This does not necessarily mean that Bebermeyer will perform the duties now performed by Maxwell. We intend rather that respondents will divide the duties incident to the operation of the repressure plant among Bebermeyer and the two other employees now engaged in operating the repressure plant, without discriminating in any way against Bebermeyer because of his union activities."

Since in this case what the Board intended by its order is left in doubt and confusion, we think the proper order to be now entered in this case is, taking cognizance of the petition, and approving the findings of the Board as to its jurisdiction, to order the enforcement of Paragraph I, the cease and desist portion of the order, but as to Paragraph II, requiring affirmative action, before entering a final decree as to it, either affirming, modifying, or setting it aside, we think the matter should be remanded to the Board for the further consideration and clarification of that part of the order. Agwilines v. National Labor Relations Board (C.C.A.) 87 F.(2d) 146, 147. When the clarified order has been entered, it and the additional proceedings, if any, taken in arriving at it, shall be supplemented and made a part of the pending record, for our final action and decree.

FOSTER, Circuit Judge, concurs in the result.

HOLMES, Circuit Judge (dissenting).

I concur in the opinion of the court that the Board had jurisdiction of the subject matter and of the parties, and properly directed the re-employment of Bebermeyer with reimbursement for the time lost, but I dissent from the conclusion that the order is ambiguous or not properly framed, and that enforcement thereof should be delayed until further action by the Board.

I think the order of the Board is wholly valid and should be enforced without any modification. It was made upon findings, fully supported by evidence, that respondents were engaged in unfair labor practices affecting commerce, as defined in the act. The statute provides that such findings shall be conclusive.

The principles to which the courts should adhere in reviewing orders of this character are the same as those applicable to orders of other fact-finding tribunals with quasi judicial powers. If the Board gives interested persons an opportunity to be heard, if it does not refuse to consider relevant evidence, if it does not proceed upon a mistake of law, if it acts upon substantial evidence sufficient to support its findings, the courts should not undertake to weigh such evidence, to inquire into the soundness of the reasoning which induced the Board's conclusions, or to question the wisdom of the provisions or requirements prescribed in the order.

The sole function of this court is to "reverse or modify the findings only if clearly improper or not supported by substantial evidence." Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 57 S.Ct. 648, 650, 81 L.Ed. ——; National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 81 L.Ed. ——, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 57 S.Ct. 645, 81 L.Ed. ——, 108 A.L.R. 1352; National Labor Relations Board v. Fruehauf Trailer Co., 57 S.Ct. 642, 81 L.Ed. ——, 108 A.L.R. 1352; Agwilines, Inc., v. National Labor Relations Board (C.C.A.) 87 F.(2d) 146, 151; National Labor Relations Board v. Associated Press (C.C.A.) 85 F.(2d) 56, 58, affirmed Associated Press v. National Labor Relations Board, 57 S.Ct. 650, 81 L.Ed. ——; National Labor Relations Board v. National New York Packing & Shipping Co., Inc. (C.C.A.) 86 F.(2d) 98, 99.

The order to dismiss Maxwell, if necessary, was designed to restore the situation existing prior to the discriminatory discharge. Unless the Board has this power, the law may easily be nullified by displacing striking employees with new men. In some of the cases cited above the Supreme Court sustained the validity of orders for reinstatement with back pay, without regard to the fact that the company, immediately upon the discharge of the old employees, had hired new ones to replace them. Since the reinstatement of discharged employees in any case might necessitate the dismissal of employees hired to take their places, I see no objection to the order providing for that contingency, and no reason to construe the order as a limitation upon the right of the respondents with reference to the retention of the other two engineers at the repressure plant.

The intention of the Board expressed in the findings, headed "The Remedy," may be vague and indefinite, but this intention was not incorporated in the order, and, therefore, is not mandatory upon respondents. It can neither be construed as a finding of fact nor a conclusion of law. I see nothing "moot" in the provision for "dismissing Maxwell, if necessary." By that provision, the Board merely intended to grant its approval of the dismissal of Maxwell, if the respondents, in their discretion, saw fit to do so. As Maxwell is not now in their employ, this permission has become unnecessary, if it ever was, but, in that view, it is mere surplusage, and does not in-

validate the other provisions which the Board deemed necessary and incorporated in this order.

The petition to enforce it should be granted.