## RAILWAY EXPRESS AGENCY, Inc., v. ORDER OF RAILROAD TELEGRAPHERS.

### No. 10509.

Circuit Court of Appeals, Fifth Circuit.

July 9, 1943.

Writ of Certiorari Granted Oct. 18, 1943.

See 64 S.Ct. 85, 88 L.Ed. ——.

Blair Foster, of Atlanta, Ga., and Albert M. Hartung, of New York City, for appellant.

William G. McRae, of Atlanta, Ga., and Leo J. Hassenauer, of Chicago, Ill., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit, in form to enforce an award of the National Railroad Adjustment Board, was for the compensation claimed to be due and unpaid various railroad agents under the contract made August 1, 1917,[1] between the Southern Express Company and the General Committee of the Order of Railroad Telegraphers in behalf of joint railway express agents on the Seaboard Air Line Railway. The claim was that the facts and law were as the Board had found; that the defendant, though not a signer of, had, as successor to the Southern Express Company, assumed or otherwise become obligated to carry the contract out; that, without effecting a change of the rates the contract fixed by giving the thirty days notice in writing provided for in it, it had in three respects[2] changed the basis of compensation provided for in the contract; and that it was liable to the agents in whose interest the suit was brought for the difference between the amounts which had actually been paid them and the amounts which, under the contract, should have been paid them. Defendant denied the jurisdiction of the board on the grounds that (a) the claimants were not employees; and (b) the claim was not with regard to a claim pending and unadjusted on June 21, 1934. It defended on the merits that: (a) The August 1, 1917 contract was not its contract by execution, assumption or otherwise, and it was not and is not bound by its terms; (b) If mistaken in this, it was not liable for any of the amounts sued for because the sums paid

---

[1] The provisions of this contract material here are:

"Effective 8–1–17, the following rules and rates of pay will govern the Southern Express Company's Agents who are jointly employed as railroad and express agents.

Article 1. This schedule applies solely to express agents as above designated.

Article 2. Commissions on total business received and forwarded, based on previous year's business, will be paid as follows:

When commissions do not exceed fifty dollars per month, ten per cent.

When commissions exceed fifty dollars per month, but not more than seventy-five dollars per month, nine per cent.

When commissions exceed seventy-five dollars per month, but not more than one hundred dollars per month, eight per cent.

When commissions exceed one hundred dollars per month, seven per cent.

When commissions do not exceed ten dollars per month a guarantee of ten dollars per month will be paid.

Article 3. At points where Agents are required to transfer express matter to or from other lines or trains, they will be paid a minimum of ten dollars ($10.00) per month for such service.

Article 5. All grievances and claims for loss or damage arising between the Southern Express Company and its Agents herein represented, which cannot be satisfactorily adjusted otherwise may be referred to the Superintendent and General Chairman representing such employes for adjustment, with the right of appeal reserved provided an amicable adjustment cannot be so reached.

Article 9. Agents will be allowed to deduct their commissions at the close of each report.

Article 12. These rules are not to be construed so as to reduce compensation at points where the rates of pay are in excess of the above rates.

Article 14. No change will be made in the foregoing articles until after notice of thirty (30) days in writing, has been given.

[2] (1) Though the contract made no provision for doing so, it had, by notice to all joint agents on the Seaboard Railway, including those at points in Florida known as strawberry shipping points, instituted and paid on all carload shipments a flat rate of $5.00 per car instead of the commission rate provided for in Article 2. Claims under this head are those of Dinkins, Agent at Lawtey, Florida, $38,744.41; Paul Smith, $445.99; R. H. Turner, $169.80; D. G. Stutz, $539.14; O. H. Smith, $161.30; Borst, $1513.23; Meares, $330.22. (2) Though Art. 2 had guaranteed a minimum commission of $10.00 per month, the defendant through individual agreements between the defendant and the agents involved had abolished this minimum. Under this head comes M. J. Stokes, $39.54, J. L. Williams, $325.79, J. E. Walker, $138.75, J. T. Williams, $88.59, I. G. Croyton, $43.27, J. H. Payne, $489.61, C. B. Holmes, $521.99, A. T. Walker, $451.50. (3) That though Art. 3, fixed a minimum of $10.00 per month for transfer services and Art. 12 stated that the rules are not to be construed to reduce compensation at points where the rates of pay are in excess of the above rates, the defendant has reduced transfer allowances. Coming under this head are Barber, $308.12, Ben-

each of the agents were paid him under a contract with him, and were paid to, and received, and retained by him as his part of the receipts in full and complete satisfaction of amounts due him for the service rendered under the contract he had with it; (c) As to Dinkins, agent at Lawtey, Florida, and the others under group one, it defended further on these grounds: that prior to the arrangement made in 1929 between the Seaboard Air Line and it for handling berries under refrigeration in carload lots, there was no carload express business in such perishables; that the 1917 contract, therefore, did not purport to cover compensation for that business; and that before making the amended agreement with the railroad to handle perishables by carload express, instead of installing its own exclusive agent at Lawtey, and compensating him on a salary basis, as it notified Dinkins it would do, it, on Dinkins' request that it not make the change, and his agreement that he would handle these cars not on a commission basis but at a flat rate of $5.00, accepted Dinkins' offer, and, thereafter, paid him $5.00 per car, that is, thereafter, Dinkins deducted his commission from the express receipts and withheld and accepted them as full compensation for services rendered in connection with carload shipments; and that all of the other agents claiming in this group made the same arrangement. Finally it pleaded The Statute of Limitations of Six Years.

The district judge sustained the board's assertion of jurisdiction, its finding of fact that defendant had assumed and was obligated on the Southern Express contract, its conclusion of law that the individual arrangements made with the agents under which the traffic was handled and the compensation paid were invalid and ineffectual to relieve defendant from the payment of the compensation provided for therein, and without finding on, but disregarding, the defense of limitation, he gave judgment as to each claimant for the amounts sued for under the three heads.

Here, abandoning its claim that the agents concerned were not in its employ, defendant urges, as it did below, that the board was without jurisdiction of the claims because they were not in 1934 pending and unadjusted disputes, and further insists that the suit was wrongly decided upon its merits.

We cannot agree with appellant that the board was without jurisdiction. It is true that as to complaints under groups (2), the abolition of the guarantee, and (3), the reduction of transfer allowances, no complaints were filed with defendant before, and therefore none were pending and unadjusted, on June 21, 1934. But it is equally true that there were claims under this head presented to the board covering grievances for years after June 21, 1934, over which the board undoubtedly had jurisdiction, sufficient to support its findings. As to claims under group (1), the institution in respect of express shipments of the $5 per car flat rate, while it is true that the record shows before June 21, 1934, only one complaint filed and that in respect of Dinkins only, and only for one year, this was sufficient to constitute a pending and unadjusted complaint as to the rights under the contract of Dinkins and other express agents affected by the change. Besides the complaint under this head also included many years after June, 1934. Neither can we agree with appellant that the board's finding that it assumed the obligations of the 1917 contract is without support in the record. It is true that the evidence to this effect is not as full as might have been expected if the contract was actually in force and that it is contrary to not only the oral evidence of the express company's officers that they never assumed the contract but to the letter of McFarland, the general manager of the Railway Express Company,[3] which in turn is consistent with the position Mr. Owens and Mr. Glyn for the company took in 1935, when written to by Thompson, chairman of the O. R. T. about matters he claimed were pending, and with the statement in Thompson's claim before the board that the company takes the position that "our organization has no agreement with the company". But it is equally true; that the O. R. T. was all along insisting that it did have the contract; that the compensations fixed in it, except where changed by special agreement, were recognized and paid by the com-

ton, $30, Johnson, $30, M. J. Stokes, $305, T. J. Womble, $150, C. F. Carlton, $1,235.

3 In his letter of June 15, 1925, he said that the American Railway Express Agency had no agreement with the Order of Railroad Telegraphers, but the Southern Express Co. did have one and this company had perpetuated the rates of commission as therein provided.

pany; and that the record contains correspondence between Scruggs, Supt. of the Express Company, and May, general chairman of the Telegraphers, in October, 1925, about claims with no suggestion on the company's part that May was not authorized to present them, but, on the contrary, with a request by Scruggs that May, as general chairman, see that agents who had overpaid themselves from company funds be required to make restitution. There is, too, correspondence in 1930, 1931 and 1932 between Bryant, vice-president of the O. R. T., Smith of the Railway Express Agency and Frank Morgan of the Alabama Public Service Commission, stating that the company did have a contract with the O. R. T. with no denial by the company that such a contract existed. We cannot say, when all of this evidence is considered, that the board's finding that the company in fact assumed, and operated under, the contract is without support in the evidence.

When it comes to the merits, though, the matter stands quite differently. In Yazoo & M. V. R. Co. v. Webb, 5 Cir., 64 F.2d 902, Illinois Cent. R. R. Co. v. Moore, 5 Cir., 112 F.2d 959, and System Federation v. L. & A. Ry. Co., 5 Cir., 119 F.2d 509, we have canvassed, and carefully set down our conclusions as to the state of the law governing suits on contracts between employers and unions of the nature of the September 17th contract made the basis of this suit. Without restating them at any length, we refer to those cases for the general principles controlling here. They hold that persons employed under the terms of such a contract have their tenure and rights governed by its terms and that for action taken contrary thereto, to their damage, there is a right of action in them or in the union to redress their grievances. They do not hold that contracts so made are binding on individual employees beyond their power to change the terms by individual contracts with their employer. On the contrary, their holding is "In the absence of any special agreement otherwise, every employment may be presumed to be on the basis of the collective agreement and to adopt its terms. But ordinarily there is nothing to prevent a special agreement if an employee desires it", Illinois Cent. R. Co. v. Moore, supra, 112 F.2d at page 964, and that "The collective agreement as such is made, defended, and changed by the union, but the rights of each employee employed under it are his own, and he may waive or assert them himself as he sees fit", 112 F.2d at page 965. Cf. Virginian Ry. v. System Federation, 300 U.S. 515, 548, 549, 57 S.Ct. 592, 600, 81 L.Ed. 789 where it is said: "We think, as the government concedes in its brief, that the injunction against petitioner's entering into any contract concerning rules, rates of pay, and working conditions, except with respondent, is designed only to prevent collective bargaining with any one purporting to represent employees, other than respondent, who has been ascertained to be their true representative. When read in its context, it must be taken to prohibit the negotiation of labor contracts, generally applicable to employees in the mechanical department, with any representative other than respondent, but not as precluding such individual contracts as petitioner may elect to make directly with individual employees. The decree, thus construed, conforms, in both its affirmative and negative aspects, to the requirements of section 2 [45 U.S.C.A. § 152]." [4]

Yazoo & M. V. R. Co. v. Webb, supra, is further illustrative. There the general contract furnished the basis of Webb's hiring, but his acceptance of a less amount under circumstances constituting an agreement between him and the company that that was all that was due him prevented his recovering more.

If then we could agree with appellee that the case is simply one where, without compliance with the provisions of the contract for changing it, appellant and each employee affected had by individual agreement changed its terms, and the com-

[4] National Licorice Co. v. Labor Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 and N. L. R. B. v. J. I. Case Co., 7 Cir., 134 F.2d 70, 72, writ of certiorari granted, 63 S.Ct. 1446, 87 L.Ed. —, are not to the contrary. They deal with the assertion of public not of private rights. "Here the right asserted by the Board is not one arising upon or derived from the contracts between petitioner and its employees. The Board asserts a public right vested in it as a public body, charged in the public interest with the duty of preventing unfair labor practices", 309 U.S. at page 364, 60 S.Ct. at page 577, 84 L.Ed. 799. Cf. Agwilines, Inc. v. N. L. R. B., 5 Cir., 87 F.2d 146; N. L. R. B. v. Williamson-Dickie, 5 Cir., 130 F.2d 260, 263, Fleming v. A. H. Belo, 5 Cir., 121 F.2d 207, 214 and note 9.

pany had thereafter paid, and the employees accepted, compensation, not on the terms provided in the general contract, but upon those especially agreed upon, this would not avail appellee. For it is quite clear that having agreed to accept and having accepted in full satisfaction for the services rendered the amounts paid them, neither the employees for themselves nor the union for them has any right of action to recover more. But, except as to the claims under group two, the abolition of a guaranteed minimum of $10 a month, and as to the claims of Stokes and Womble under group three, the reduction of transfer allowances, the case does not stand that way.

As to the claims of Barber, Benton, Johnson and Carlton under group three, the special agreements made with them were not in violation of the contract, for the transfer allowances were not reduced below $10, the minimum fixed in Art. 3 of the contract, but as to the first three, from $25 to $20, and as to Carlton, at first from $25 to $20 and later to $15. Appellee's contention that Art. 12 operates to raise the minimum above the $10 fixed in Art. 3 will not do. Such a provision either in a contract or in a statute is without effect to prevent changes in agreed rates of compensation so long as those changes do not fall below the minimum the contract or statute fixes.[5]

As to the claims in group one, there was no violation of the contract, because, under the undisputed evidence, carload express shipments of perishables were not within the contemplation of the contracting parties and were not included within its terms. Indeed they were not instituted until 1929. Further, if it be considered that the contract does cover such business, the written notice given to every joint agent, including Meares, local chairman for the division and by him to the general chairman,[6] and the securing of the consent to the arrangement of each agent affected, was the substantial equivalent of the notice provided for in Art. 14. Still further, in the case of Dinkins, to hold appellant liable now for the extortionate commissions he claims would be to permit Dinkins to profit by his own wrong and grossly and unjustly enrich him, contrary to his agreement, to his conduct under it, and to appellant's action on it, that if it did not, as it had a right to do, and as it had already done at Starke, establish at Lawtey an exclusive salaried agent, he would handle carload shipments at $5.00 per car. The other claims under this group, while not so shocking in amount, are ruled by the same principle. Finally while, if we are correct in our view that there can be no recovery, the question whether the statute of limitations of six years is a bar to the action in whole or in part is immaterial, we think we should say that we are in no doubt that the bar of the statute has fallen as to all of the amounts sued for which accrued more than six years before the suit was filed. The judgment is reversed and the cause is remanded for further and not inconsistent proceedings.

5 Cf. Sec. 18, Fair Labor Standards Act, 29 U.S.C.A. § 218 as construed in Walling v. A. L. Belo Corp., 316 U.S. 624, 630, note 6, 62 S.Ct. 1223, 86 L. Ed. 1716; White v. Witmer, 8 Cir., 132 F.2d 108, Tinerella v. Des Moines Transp. Co., D.C., 41 F.Supp. 798, Remer v. Czaja, D.C., 36 F.Supp. 629.

6 On June 16, 1930, Meares, Local Chairman for the Division wrote Mr. Harrison as follows: "Referring to our conversation this A. M. relative to previous handling on separation of express agency at this point. Beg to say that I will go ahead on the commission on carload shipments of $5.00 per car and that I am not handling the matter further with the committee which represents us as agents over the Seaboard Sys., will state that I did in Apl. send our general chairman advice as to the instructions from Supt. May in regards to the $5.00 commission on car load lots, however, I do not know whether he ever handled the matter or not and I do not know whether he intends to handle the matter. I give the Genl. Chm. advice regarding the above as it was one of my duties as Local Chairman for this Divn. of Agent to keep the Genl. Chm. posted of anything that concerned us as Agents over the Seaboard. I hope this explanation will be satisfactory to all concerned."